Filing # 154550824 E-Filed 08/02/2022 04:58:06 PM

IN THE CIRCUIT COURT OF THE 6TH
JUDICIAL CIRCUIT, IN AND FOR
PINELLAS COUNTY, FLORIDA

Case No. 22-003535-CI

I3 MICROSYSTEMS, INC. F/K/A I3
TECHNOLOGIES, INC,

      Plaintiff,

vs.

THE CHARLES STARK DRAPER
LABORATORY, INC.,

      Defendant.

_____/

## AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

Plaintiff, I3 Microsystems, Inc. f/k/a I3 Technologies, Inc. ("Plaintiff"), hereby files this Amended Complaint against Defendant, The Charles Stark Draper Laboratory, Inc. ("Defendant"), and in support thereof, alleges the following:

## THE PARTIES, JURISDICTION AND VENUE

1.      Upon information and belief, The Charles Stark Draper Laboratory, Inc. is a Massachusetts non-profit corporation with its principal office located at 555 Technology Square, Cambridge, MA 02139.

2.      Plaintiff is a New York Corporation authorized to conduct business in the State of Florida with its principal office located at 9900 16th Street, St. Petersburg, Florida 33716.

3.      Jurisdiction is proper in this State, as the subject matter of this action is based upon the terms of a lease agreement between the parties, whereas Section 18.11 of said agreement affirms the State of Florida as the governing law.

*I3 Microsystems, Inc. v. The Charles Stark Draper Laboratory, Inc.*
Case No. 22-003535-CI
Amended Complaint

4.      Venue is proper in this Court as the underlying action herein is based upon allegations and claims that arose in the principal place of Pinellas County, Florida.

5.      This Court has subject matter jurisdiction because it is a declaratory relief action and breach of contract in which the matter in controversy exceeds $30,000.00.

6.      Plaintiff requests construction of a written lease agreement and a declaration of Plaintiff's rights under said agreement.

7.      Declaratory relief is proper regarding the subject matter of this action because Plaintiff has paid all monies due and owing under the lease agreement pursuant to an option to purchase provision entitling it to a deed conveying the property and justiciable controversy exists, as more specifically set forth below:

**FACTS COMMON TO ALL COUNTS**

8.      On January 11, 2018 Plaintiff and Defendant entered into a lease agreement (the "Lease Agreement") for the property known as Lots 26 and 27, Block C of Metropointe Commerce Park Phase II according to the plat thereof recorded in Plat Book 103, Pages 25 and 26 located in the City of St. Petersburg, Pinellas County, Florida, containing approximately 2.673 acres of land, located in the Industrial Limited (IL) land use designation, and all easements, privileges, hereditaments and appurtenances in, on, under or affecting Lots 26 and 27 (but excluding any public streets, ways and alleys abutting or adjoining Lots 26 and 27, which public streets, ways or alleys, (the "Property"). A copy of the Lease Agreement is attached hereto as **Exhibit "A."**

9.      Pursuant to the Lease Agreement, Plaintiff would lease the Property from Defendant from January 11, 2018 through January 11, 2023 (the "Lease Period").

I3 Microsystems, Inc. v. The Charles Stark Draper Laboratory, Inc.
Case No. 22-003535-CI
Amended Complaint

10.     Pursuant to Section 3.1 of Article 3 of the Lease Agreement, Plaintiff would remit

monthly payments of $16,666.67 to Defendant on the last day of each month during the sixty (60)

month Lease Period.

11.     Pursuant to Article 19 of the Lease Agreement, Plaintiff has the option to purchase

the Property from Defendant if all amounts payable under the Lease Period were paid by Plaintiff

prior to the expiration of the Lease Period:

> 19.1. Purchase of the Premises.
>
> On and as of the fifth anniversary of the Closing Date (or the earlier payoff of all amounts due and owing under this Agreement), provided that no Event of Default exists, Draper (or its assigns, as the case may be) shall transfer and convey to i3 Technologies, and i3 Technologies will accept and assume, and the Premises (and any liabilities and obligations related thereto) for consideration of One Dollar ($1.00). The form of the Special Warranty Deed (the "Deed") for the conveyance shall be substantially in the form attached hereto as Exhibit B. Draper shall convey title without any liens or encumbrances except for those liens or encumbrances that exist at the time of the execution of this Agreement and except for additional utility easements, covenants or restrictions compatible with the current usage of the Premises.

12.     Pursuant to Section 3.5 of Article 3 of the Lease Agreement, Plaintiff would not be

subject to any penalty if it paid off the remaining balance early under the Lease Agreement.

13.     By letter dated February 28, 2022, Plaintiff notified Defendant of its intent to

exercise its option to purchase the Property. A copy of said letter is attached hereto as **Exhibit

"B."**

14.     On March 2, 2022, Plaintiff complied with the pre-payment terms by remitting a

wire transfer in the amount of $216,666.67 representing full payoff under the Lease Agreement.

A composite copy of said wire transfer is attached hereto as **Exhibit "C."**

15.     At the time of exercise of the option, all payments of rent were current.

*I3 Microsystems, Inc. v. The Charles Stark Draper Laboratory, Inc.*
Case No. 22-003535-CI
Amended Complaint

16.    At the time of exercise of the option, no notice of default had been given with respect to any lease term or default asserted by Defendant. Notably, section 19.1 of the Lease permits exercise of the option in the absence of an Event of Default as defined in the Lease.

17.    No Event of Default had occurred or was in effect at the time of the exercise of the option.

18.    Defendant failed to comply and execute the deed.

19.    On March 30, 2022, Defendant sent a Notice of Default in response to Plaintiff's already exercised option and payment for purchase of the property citing numerous defaults under separate subcontracts stemming from a Master Sub Lease dated 1/13/18 and subsequent amendments, but failed to cite any defaults under the January 11, 2018 Lease Agreement.

20.    Draper wrongfully attempted to dishonor the transfer of the property by citing defaults under other agreements when the Lease Agreement does not contain any cross-default provisions. (See Exhibit A- Lease Agreement).

21.    By letter dated April 28, 2022, Plaintiff responded to Defendant and disputed the existence of any defaults under any other agreements, that Plaintiff did not trigger defaults under the Lease Agreement and again demanded deed to the premises be immediately turned over. A copy of said Letter is attached hereto as **Exhibit "D."**

22.    Over two months later, on May 10, 2022, Defendant returned all pre-payment monies to Plaintiff stating I3 could not exercise its option to purchase because I3 was in default and cannot exercise its option to purchase if it was in default and that payment was not in full. Defendant alleged that Plaintiff was in default of various agreements and specifically Section 7.2 of the Lease Agreement that stated the following:

I3 Microsystems, Inc. v. The Charles Stark Draper Laboratory, Inc.
Case No. 22-003535-CI
Amended Complaint

> 7.2 Performance Requirements. i3 Technologies agrees that it shall use *best efforts* to make such investments and otherwise take such actions as may reasonably be necessary to ensure that the Business produces items in sufficient quality and quantity to (i) obtain and maintain a security clearance for the facility; (ii) obtain and maintain ISO certification; and (iii) satisfy quality and scheduling needs of Draper's current and future customers, as set forth in the Subcontract Agreements to be negotiated by the parties, as defined in the Purchase Agreement. Draper shall have first priority for any work to be performed in the facility against any other customers' work.

Composite copies of May 10, 2022 letter and attachments are attached hereto as **Exhibit "E."**

23.   On May 10, 2022, Plaintiff put all pre-payment monies in escrow held at Hinman, Howard & Kattell, LLP.

24.   By letter dated May 17, 2022, Plaintiff informed Defendant that the returned funds were placed in its attorneys' escrow account and deemed said funds paid in accordance with Lease Agreement and inquired why payment was deficient. A copy of said letter is attached hereto as **Exhibit "F."**

25.   After Defendant's May 10, 2022 letter, Plaintiff was advised for the first time that its payment made on February 28, 2022 was not correct and it was deficient one month's payment ($16,666.67) and Plaintiff immediately put said amount into its attorney's escrow account.

26.   Plaintiff continues to perform under the Lease Agreement by remitting monthly lease payments to Defendant out of the purchase price monies being held in escrow because of this dispute.

27.   To date, Defendant has failed to deed the Property to Plaintiff.

28.   Defendant claims Plaintiff is in breach of the Lease Agreement for failing to use its "best efforts" in maintaining quality or quantity, ISO Certification and security clearance:
**(See May 10, 2022 letter- Exhibit "E").**

29.    Pursuant to Article 15 of the Lease Agreement an Event of Default is not deemed to have occurred until ten (10) days after i3 shall have received notice from Draper that such monetary covenant, term or prevision has not been complied with and continued uncured after the expiration of such ten (10) day period.  (See Lease Agreement- **Exhibit "A"**).  Based on Article 15, Draper did not provide any Notice of Default prior to Plaintiff exercising its option to purchase the Leased Premises.

30.    Plaintiff has retained counsel with respect to this action and to enforce its rights pursuant to the Lease, and has agreed to pay such counsel a reasonable fee.

## COUNT I
## DECLARATORY RELIEF
### (Declaratory Judgment Act Fla. Stat. §86.1

31.    Plaintiff repeats and realleges each and every allegation as set forth in paragraphs "1" through "30" as if fully set forth above.

32.    Defendant now attempts to assert defaults of non-monetary provisions that prevent Plaintiff from exercising said option.

33.    However, under the terms of the Lease Agreement, there was no Event of Default at the time Plaintiff exercised its option to purchase according to the terms of the Lease Agreement.

1.    Further, Article 15 (d) provides:

An "Event of Default" shall occur …

> (d) if i3 Technologies shall neglect or fail to perform any of the other non-monetary covenants, terms or provisions contained in this Agreement on i3 Technologies' part to be performed or observed thirty (30) days after receipt of notice of default from Draper, or such additional time beyond said 30-day period after receipt of notice of default from Draper, as may be reasonably required to correct any non-monetary default provided, in connection with any cure period exceeding thirty (30) days, that i3 Technologies is diligently and continuously pursuing a timely cure for such non-monetary default

*I3 Microsystems, Inc. v. The Charles Stark Draper Laboratory, Inc.*
Case No. 22-003535-CI
Amended Complaint

> and such non-monetary default is of a nature which is susceptible of
> cure and is not of a nature which could result in criminal sanctions
> or a forfeiture of Draper's interest in the Premises and does not
> constitute a threat to public health or safety …

(See Lease Agreement - **Exhibit "A"**).

34.     The alleged defaults that Defendant references are the type of defaults that Plaintiff
is using its best efforts to cure and Defendant was well aware of it and are acting in bad faith to
allege them to be "Events of Defaults" to prevent the transfer of the property and wrongfully
interfere with Plaintiff's right to acquire the Property.

35.     Moreover, even if Defendant now asserts curable breaches, Defendant never
provided prior notice and opportunity to cure as required under the Lease and accordingly no
Events of Default were in effect at the time of exercise of the option.

36.     Defendant in bad faith is trying to prevent the transfer of the property to Plaintiff
by alleging Plaintiff is in default AFTER it exercised its option to purchase the property.

37.     Plaintiff faithfully performed (and continues to perform) under the terms of the
Lease Agreement.

38.     Plaintiff used its best efforts to meet its business obligations, maintain security
clearance and maintaining ISO Certification.

39.     The purported issues raised by Defendant in its correspondence with Plaintiff stem
from the working relationship between Plaintiff and Defendant, including but not limited to:

a.   Plaintiff being forced to accept a firm fixed price with no quantity commitment
     and no equitable adjustment allowed where quantities are not met.

*I3 Microsystems, Inc. v. The Charles Stark Draper Laboratory, Inc.*
Case No. 22-003535-CI
Amended Complaint

    b. Defendant refuses to cooperate with Plaintiff to properly schedule work, leaving Plaintiff unable to properly fund programs and hire sufficient staff as it cannot anticipate production needs of Defendant.

WHEREFORE, Plaintiff demands a declaratory judgment declaring

   a. Plaintiff has a valid and binding Lease  and tenancy with respect to the property:

   b. Plaintiff properly exercised its right to purchase;

   c. Ordering Defendant to sign a deed transferring the property to Plaintiff;

   d. Enjoining Defendant from transferring the Property to any party other than Plaintiff,

   e. Payment of its attorney's fees and costs, and

   f. Such other and further relief this Court deems just and proper.

## COUNT II
## BREACH OF CONTRACT

  40. Plaintiff repeats and realleges each and every allegation as set forth in paragraphs "1" through "39" as if fully set forth above.

  41. Plaintiff and Defendant agreed to the right to purchase option under Article 19 of the Lease Agreement. See **Exhibit "A."**

  42. Both Plaintiff and Defendant signed the Lease Agreement.

  43. Plaintiff substantially complied with the right to purchase option on March 2, 2022.

  44. Plaintiff is entitled to the right to purchase the Property.

  45. Defendant has refused to perform under the Lease Agreement by deeding the Property to Plaintiff.

*I3 Microsystems, Inc. v. The Charles Stark Draper Laboratory, Inc.*
Case No. 22-003535-CI
Amended Complaint

46.     Due to the fact that Defendant failed to perform its duties under the terms of the Lease Agreement, Defendant breached the terms of said agreement.

47.     Plaintiff fully complied with the terms and conditions of the Lease Agreement.

48.     The terms of the Lease Agreement do not provide that Plaintiff would be in default for any alleged failure under other agreements between the Parties.

49.     Plaintiff has suffered additional damages by Defendant's breach of contract including but not limited in the following ways:

>        a.  Plaintiff is unable to make necessary changes/improvements to the Property to make its production more profitable;
>
>        b.  Plaintiff is unable to invest in necessary IT equipment for the Property;
>
>        c.  Plaintiff is unable to install necessary equipment in the Property to make its production more profitable; and

WHEREFORE, Plaintiff requests judgment against Defendant for breach of contract as follows:

a.     Plaintiff demands specific performance under the Lease Agreement requiring Defendant to issue a deed to the Property to Plaintiff;

b.     Damages in an amount to be determined at trial which exceed $30,000.00, including consequential and special damages, as well as pre and post-judgment interest and costs

c.     Payment and recovery of attorneys' fees and costs for enforcement of its rights under the contracts and in the prosecution of this action; and

d.     Such other and further relief as the Court deems just and proper.

<u>*I3 Microsystems, Inc. v. The Charles Stark Draper Laboratory, Inc.*</u>
Case No. 22-003535-CI
Amended Complaint

## COUNT III
## SPECIFIC PERFORMANCE OF PURCHASE OPTION

50.     Plaintiff repeats and realleges each and every allegation as set forth in paragraphs "1" through "49" as if fully set forth above.

51.     Plaintiff exercised its option to purchase on March 2, 2022.

52.     Plaintiff and Defendant have a binding contract entitling Defendant the right to purchase the Property.

53.     Defendant has breached its contractual obligation to deliver the Property to Plaintiff.

54.     The Property is real property and is unique.

55.     Plaintiff demands specific performance of Defendants obligation to transfer the property to Plaintiff.

WHEREFORE, Plaintiff requests judgment in its favor and against Defendant as follows:

a.      Plaintiff demands specific performance of the purchase option and Defendants contractual right to transfer the property to Plaintiff including the issuance of a deed granting the Property to Plaintiff;

b.      Payment and recovery of attorneys' fees and costs for enforcement of its rights under the contract and in the prosecution of this action; and

c.      Such other and further relief as the Court deems just and proper.

*I3 Microsystems, Inc. v. The Charles Stark Draper Laboratory, Inc.*
Case No. 22-003535-CI
Amended Complaint

Dated this 2nd day of August, 2022.

                              Respectfully submitted,

                              **LORIUM PLLC**
                              *Counsel for Plaintiff*
                              197 South Federal Highway, Suite 200
                              Boca Raton, FL 33432
                              Telephone: 561.361.1000
                              Facsimile: 561.672.7581
                              Email: jgrant@loriumlaw.com
                                      capugatch@loriumlaw.com

                              By: ___ /s/ Joe M. Grant _____
                                      JOE M. GRANT
                                      Florida Bar No. 137758
                                      CRAIG A. PUGATCH
                                      Florida Bar No. 653381

# EXHIBIT A

# LEASE AGREEMENT

EXECUTION

REAL PROPERTY LEASE AND AGREEMENT

THE CHARLES STARK DRAPER LABORATORY, INC.

and

i3 TECHNOLOGIES, INC.

Dated as of January 11, 2018

ACTIVE/93287138.7

**TABLE OF CONTENTS**

**Page**

ARTICLE 1 Premises, Lease Term and Agreement Expiration ................................................. - 2 -

    1.1.    The Land .......................................................................................... - 2 -
    1.2.    Condition of the Premises ................................................................ - 2 -
    1.3.    Term ................................................................................................ - 3 -
    1.4.    Delivery and Acceptance of Possession ......................................... - 3 -
    1.5.    Agreement Expiration Date ............................................................. - 3 -

ARTICLE 2 Permitted Uses; Compliance with Laws ........................................................... - 3 -

    2.1.    Permitted Uses; Continuous Operation .......................................... - 3 -
    2.2.    Compliance with Laws ................................................................... - 3 -

ARTICLE 3 Rent .................................................................................................................. - 5 -

    3.1.    Payments Due ................................................................................. - 5 -
    3.2.    Method of Payment ........................................................................ - 5 -
    3.3.    Rent Net to Draper ......................................................................... - 5 -
    3.4.    Carry Costs ..................................................................................... - 6 -
    3.5.    No Release of Obligations .............................................................. - 6 -
    3.6.    Deed to Secure Obligations ........................................................... - 6 -

ARTICLE 4 Real Estate Taxes ............................................................................................. - 6 -

    4.1.    Impositions ..................................................................................... - 6 -
    4.2.    Impositions Assessed Against Draper ............................................ - 7 -
    4.3.    i3 Technologies' Failure to Promptly Pay Impositions ................. - 7 -
    4.4.    Validity of Impositions ................................................................... - 7 -

ARTICLE 5 Insurance .......................................................................................................... - 7 -

    5.1.    Liability, Hazard and Other Insurance ........................................... - 7 -
    5.2.    Indemnity ........................................................................................ - 9 -
    5.3.    Waiver of Subrogation ................................................................... - 10 -
    5.4.    Draper's Insurance ......................................................................... - 10 -

ARTICLE 6 Utilities and Services ....................................................................................... - 10 -

ARTICLE 7 Repairs and Maintenance; Performance Requirements ................................... - 10 -

ARTICLE 8 Environmental Indemnity ................................................................................ - 11 -

    8.1.    Definitions Related to Hazardous Materials .................................. - 11 -
    8.2.    Release of Hazardous Materials ..................................................... - 11 -
    8.3.    Indemnity ........................................................................................ - 11 -
    8.4.    Draper's Right to Inspect ............................................................... - 12 -

ARTICLE 9 Assignment, Letting and Mortgaging ............................................................. - 12 -

    9.1.    Letting ............................................................................................ - 12 -

i

9.2.    Assignment and Mortgaging ................................................................. - 13 -
9.3.    Expenses of Draper ............................................................................. - 13 -

ARTICLE 10 Casualty Damage ................................................................................... - 13 -

10.1.   Restoration .......................................................................................... - 13 -
10.2.   Conditions of Work ............................................................................. - 14 -

ARTICLE 11 Eminent Domain and Public Dedication .............................................. - 14 -

11.1.   Total, Partial Taking; Termination of Lease ....................................... - 14 -
11.2.   Partial Taking - Lease Continues ........................................................ - 14 -
11.3.   Restoration of the Premises ................................................................. - 15 -
11.4.   Abatement of Rent ............................................................................... - 15 -
11.5.   Temporary Taking ............................................................................... - 15 -
11.6.   Rights of Participation ......................................................................... - 15 -
11.7.   Notice of Proceeding ........................................................................... - 15 -

ARTICLE 12 No Broker Representation ..................................................................... - 15 -

ARTICLE 13 Quiet Enjoyment ................................................................................... - 16 -

ARTICLE 14 Surrender of Premises ........................................................................... - 16 -

ARTICLE 15 Default ................................................................................................... - 16 -

15.1.   Events of Default ................................................................................. - 16 -
15.2.   Indemnity and Hold Harmless Provision ............................................ - 17 -
15.3.   Draper's Right to Repossess during Lease Term ................................. - 17 -
15.4.   Draper's Right to Possession by Mortgage Foreclosure ..................... - 17 -

ARTICLE 16 Alterations; No Draper Obligations to Make Optional Improvements ... - 18 -

16.1.   Conditions for Making Alterations and Optional Improvements ......... - 18 -

ARTICLE 17 Ownership of Improvements ................................................................. - 18 -

ARTICLE 18 Miscellaneous Provisions ..................................................................... - 19 -

18.1.   Nondiscrimination ............................................................................... - 19 -
18.2.   Draper's Liability; i3 Technologies' Liability .................................... - 19 -
18.3.   Status Report ....................................................................................... - 19 -
18.4.   Provisions Binding .............................................................................. - 19 -
18.5.   Invalidity of Particular Provisions ...................................................... - 20 -
18.6.   [INTENTIONALLY OMITTED.] ....................................................... - 20 -
18.7.   Waiver .................................................................................................. - 20 -
18.8.   Draper's Right of Self-Help ................................................................ - 20 -
18.9.   Interest ................................................................................................. - 20 -
18.10.  Amendments ........................................................................................ - 21 -
18.11.  Governing Law .................................................................................... - 21 -
18.12.  Notices - 21 -
18.13.  Force Majeure ...................................................................................... - 22 -
18.14.  Survival of Certain Provisions ............................................................ - 22 -
18.15.  "Legal Costs" Defined ........................................................................ - 22 -

ii

ARTICLE 19 i3 Technologies' Purchase of the Premises ................................................................. - 22 -

19.1.   Purchase of the Premises. ................................................................. - 22 -

iii

*SUMMARY OF LEASE AND AGREEMENT*

DRAPER:                              The Charles Stark Draper Laboratory, Inc.

i3 TECHNOLOGIES:                     i3 Technologies, Inc.

LAND:                                The land described in **Exhibit A** to this Lease.

PREMISES:                            The Land, together with the buildings and other
                                     improvements situated thereon and the fixtures
                                     constituting real estate attached thereto, and all
                                     easements and other rights and interests appurtenant
                                     thereto.

BUSINESS:                            As defined in the first recital of this Agreement.

PURCHASE AGREEMENT:                  That certain Purchase Agreement, dated as of
                                     December 20, 2017, between Draper and i3
                                     Technologies pertaining to the Premises and the
                                     business conducted thereon.

COMMENCEMENT DATE:                   The Closing Date (as defined in the Purchase
                                     Agreement).

LEASE TERM:                          Commencing on the Commencement Date and
                                     expiring at midnight on the day immediately prior
                                     to the fifth (5th) anniversary date of the
                                     Commencement Date, provided that, although the
                                     lease shall terminate upon the delivery of the Deed
                                     by Draper to i3 Technologies pursuant to Article
                                     19, the effectiveness of this Agreement extends
                                     beyond the Lease Term.

PERMITTED USES:                      Uses of the Premises permitted in accordance with
                                     the provisions of Article 2 hereof.

RENT:                                The payments provided in Section 3.1 hereof.

CARRY COSTS:                         As defined in Section 3.4.

AGREEMENT EXPIRATION DATE:           The date upon which all Rent shall have been paid
                                     in full by i3 Technologies to Draper following
                                     expiration of the Lease Term.

ACTIVE/93287138.7

REAL PROPERTY LEASE AND AGREEMENT

THIS REAL PROPERTY LEASE AND AGREEMENT (this "Agreement"), is made as of January 11, 2018 (the "Commencement Date") by and between THE CHARLES STARK DRAPER LABORATORY, INC., a Massachusetts non-profit corporation ("Draper"), and i3 TECHNOLOGIES, INC., a New York corporation ("i3 Technologies") or its assignee.

*RECITALS:*

WHEREAS, Aurora Semiconductor, LLC ("Aurora") currently conducts a semiconductor wafer technology production business (the "Business") utilizing Draper-owned facility located at the Premises;

WHEREAS, pursuant to a Purchase Agreement, by and between Aurora, Integra and Draper, to be entered into on or around the date hereof (the "Repurchase Agreement"), Draper will, among other things, acquire from Aurora all of Aurora's right, title and interest in and to the Subject Assets and the Intellectual Property (the "Repurchase");

WHEREAS, Draper and i3 Technologies have entered into that certain Purchase Agreement dated as of December 20, 2017 (the "Purchase Agreement"), under which the parties have set forth their understandings with respect to the lease and the sale of certain assets of the Business from Draper to i3 Technologies immediately following the Repurchase; and

WHEREAS, this Agreement sets forth the terms and conditions to effectuate the lease and sale of the Premises, and the covenants and agreements binding upon i3 Technologies following expiration of the Lease Term, all as contemplated in the Purchase Agreement.

*AGREEMENTS:*

NOW, THEREFORE, Draper and i3 Technologies hereby agree as follows:

*RULES OF CONSTRUCTION; DEFINITIONS:*

This Agreement supersedes all other agreements concerning the lease of the Premises, whether oral or in writing, between i3 Technologies and Draper. This Agreement also contains terms and conditions pertaining to the payment by i3 Technologies to Draper of the remaining Rent following expiration of the Lease Term, and terms and conditions binding upon i3 Technologies until the Agreement Expiration Date.

All exhibits and schedules to this Agreement are incorporated herein. The use of the singular of terms which are defined herein (in the plural or the singular) shall mean and refer to any one of them, or a particular one of them, as the context permits or requires; the use of the plural of terms which are defined herein (in the singular or the plural) shall mean and refer to all or any combination of them, as the context permits or requires; and pronouns used herein shall be deemed to include the singular and the plural and all genders.

Use of the connective "or" is not intended to be exclusive unless used with the word "either"; the term "may not" is intended to be prohibitive and not permissive; use of "includes" and "including" is intended to be interpreted as expansive and amplifying and not as limiting in any way.

Terms defined elsewhere in this Agreement, including without limitation the Summary of Lease and Agreement set forth above, shall have the respective meanings ascribed to them where so defined. Draper and i3 Technologies hereby expressly agree that the Summary of Lease and Agreement, the

Recitals and the Rules of Construction; Definitions sections are incorporated by reference into this Agreement.

## ARTICLE 1
### Premises, Lease Term and Agreement Expiration

1.1.   The Land.   Draper, for and in consideration of the rent, terms, covenants and conditions herein reserved and contained on the part of i3 Technologies to be paid, kept and performed, hereby leases to i3 Technologies, and i3 Technologies hereby leases from Draper, upon and subject to the terms, covenants and conditions herein set forth (the "Lease"), the Premises, subject, however, to the following: (a) any facts that an accurate survey or personal inspection of the Premises would show; (b) easements, covenants and restrictions existing as of the date hereof or hereafter existing on the Premises unless caused by Draper's acts following the Commencement Date; (c) present and future Laws (as defined in Article 2), of all boards, bureaus, commissions and bodies of any municipal, county, state, federal or other governmental body now or hereafter having or acquiring jurisdiction over the Premises and/or the use or improvement thereof (each a "Governmental Authority"); (d) violations of Laws, whether or not recorded or noted, of a Governmental Authority, against or affecting the Premises as the same may exist on the Commencement Date or hereafter existing against or affecting the Premises unless caused by Draper's acts following the Commencement Date; (e) all taxes, duties, assessments, special assessments, water charges and sewer rents and any other impositions by a Governmental Authority, fixed or not fixed, accrued or payable from and after the Commencement Date; and (f) the condition and state of repair of the Premises as the same may be on the Commencement Date.

1.2.   Condition of the Premises.

(a)   Subject to a Phase 1 Environmental Assessment, i3 Technologies acknowledges that i3 Technologies has made thorough inspections and investigations of the Premises and i3 Technologies agrees to accept the Premises "AS-IS, WHERE IS, AND WITH ALL FAULTS" upon the Commencement Date and in the condition existing as of the Commencement Date, without any reduction in or abatement of the Rent except as determined by the Phase 1 Environmental Assessment. i3 Technologies agrees that when the Deed is delivered pursuant to Article 19 below, i3 Technologies agrees that the then subsisting "AS-IS, WHERE IS, AND WITH ALL FAULTS" condition of the Premises will be deemed satisfactory to i3 Technologies as the buyer (except to the extent of any breach by Draper of the Agreement). i3 Technologies has undertaken all such investigations of the Premises as i3 Technologies deems necessary or appropriate under the circumstances as to the status of the Premises, the legal title to the Premises and Laws affecting the same, and based upon same, i3 Technologies is and will be relying strictly and solely upon the Phase 1 Environmental Assessment, such inspections and examinations and the advice and counsel of its own consultants, agents, legal counsel and officers.

(b)   Neither party to this Agreement is relying on any statement or representation not expressly stated in this Agreement. i3 Technologies specifically confirms and acknowledges that in entering into this Agreement, i3 Technologies has not been induced by, and has not relied upon, whether express or implied, warranties, guaranties, promises, statements, inducements, representations or information pertaining to the Premises or its uses, the physical condition, environmental condition, state of title, income, expenses or operation of the Premises, or any other matter or thing with respect thereto, written or unwritten, whether made by Draper or any agent, employee or other representative of Draper, or any broker or any other person representing (or purporting to represent) Draper, which are not expressly set forth in this Agreement. Draper shall not be liable for or bound by any written or unwritten statements, representations, warranties, brokers' statements or other information pertaining to the Premises furnished by Draper, any broker, any agent, employee or other actual (or purported)

- 2 -

representative of Draper, or any person, unless and only to the extent the same are expressly set forth in this Agreement.

(c)    Draper makes no warranty with respect to the presence of any hazardous or toxic substances on, above, beneath or discharged from the Premises (or any adjoining or neighboring property) or in any water on or under the Premises.  i3 Technologies assumes all risks in connection with the Premises and the commencement hereunder shall be deemed to constitute an express waiver of i3 Technologies' right to recover from Draper (except for liabilities and costs associated with the Phase 1 Environmental Assessment, if any), and forever releases, covenants not to sue and discharges Draper from, any and all damages, demands, claims, losses, liabilities, penalties, fines, liens, judgments, costs or expenses whatsoever, including attorneys' fees and costs, whether direct or indirect, known or unknown, foreseen or unforeseen, now existing or that may arise on account of or in any way be connected with the physical condition of the Premises.

The provisions of this Section 1.2 shall survive the Lease Term and shall not be deemed to have merged into any of the documents executed or delivered at the Lease Term.

1.3.    Term.  TO HAVE AND TO HOLD the Premises for the Lease Term.

1.4.    Delivery and Acceptance of Possession.  Draper will deliver possession of the Premises to i3 Technologies on the Commencement Date; i3 Technologies shall accept, subject to the terms hereof, possession of the Premises on the Commencement Date.

1.5.    Agreement Expiration Date.  Only upon payment in full by i3 Technologies to Draper of all Rent due pursuant to this Agreement, following the Agreement Expiration Date, shall this Agreement expire, but for any obligation of i3 Technologies to Draper that may survive expiration of this Agreement as contemplated hereby, whereupon neither party shall have any further obligation to or liability to the other thereafter accruing hereunder.

ARTICLE 2
Permitted Uses; Compliance with Laws

2.1.    Permitted Uses; Continuous Operation.  The Premises shall be used and occupied until the Agreement Expiration Date primarily for the construction and operation of the Business (the "Permitted Uses").  i3 Technologies acknowledges that Draper has entered into this Agreement in reliance upon i3 Technologies' covenant to use the Premises for the Permitted Uses, and therefore expressly agrees that use of the Premises, other than for Permitted Uses, without the express written consent of Draper, which shall not be unreasonably withheld so long as such other proposed use does not interfere with i3 Technologies' work on behalf of Draper, shall be a default hereunder with respect to which Draper, in addition to all of the rights available at law, shall have all rights available in equity, including the right to enforce this obligation by injunctive relief and specific performance.

2.2.    Compliance with Laws.

(a)    i3 Technologies shall, at all times during the Lease Term, at i3 Technologies' own cost and expense, perform and comply with, and shall cause all occupants, licensees and operators to promptly comply with, all laws, rules, orders, ordinances, regulations, and requirements now or hereafter enacted or promulgated, of every Governmental Authority and of any agency thereof, relating to the Premises and the Business, or the facilities or equipment therein, or the streets, sidewalks, curbs, and gutters on the Premises and forming a part of the Premises, or the appurtenances to the Premises, or the franchises and privileges connected therewith, or any condition or use of the Premises, including land-use,

- 3 -

ACTIVE/93287138.7

environmental and operational laws, rules, orders, ordinances, regulations and requirements (collectively, the "Laws") whether or not such Laws so involved shall necessitate structural changes, improvements, interference with use and enjoyment of the Premises or the Business, replacements, or repairs, extraordinary as well as ordinary, and i3 Technologies shall so perform and comply, whether or not such Laws shall now exist or shall hereafter be enacted or promulgated, and whether or not such Laws can be said to be within the present contemplation of the parties hereto. In addition, if prior to commencement of the Lease Term, i3 Technologies or its agents goes onto the Premises to perform any acts, such acts shall be performed in compliance with Laws and all other applicable terms and conditions of this Agreement. Except as otherwise provided in Section 2.2(b) below, no provision of this Agreement shall be construed so as to permit i3 Technologies to postpone compliance with such Laws if any Governmental Authority shall threaten to carry out any work to comply with the same or to foreclose or sell any lien affecting all or any part of the Premises. i3 Technologies shall, in the event of any violation or any attempted violation of this Section 2.2 by any occupant, licensee or operator, take steps, immediately upon knowledge of such violation, as i3 Technologies determines to be reasonably necessary to remedy or prevent the same as the case may be.

(b)     i3 Technologies shall have the right, provided it does so with due diligence and dispatch, to contest by appropriate legal proceedings, without cost or expense to Draper, the validity of any Laws of the nature hereinabove referred to in this Section 2.2. i3 Technologies may postpone compliance with such Laws until the final determination of such proceedings but only so long as such postponement of compliance will not subject Draper to any criminal prosecution or civil action or liability, or any costs or other liability or loss of any kind against Draper or the interest of Draper in the Premises which may arise by reason of postponement or failure of compliance with such Laws and only so long as such postponement of compliance will not have an adverse effect on the public health or safety as reasonably determined by Draper, and i3 Technologies shall indemnify and hold Draper harmless from all costs, claims, losses and liabilities in any way relating to the same, including "Legal Costs" as hereinafter defined in Section 18.15.

(c)     i3 Technologies shall Use and Occupy (as hereinafter defined) the Premises consistent with the normal hours of operation for the Permitted Uses, subject to the cessation of such uses as shall be reasonably required for (i) maintenance and repair or alterations to the Business and/or the Premises; (ii) as shall be reasonably required in connection with restoration resulting from any casualty or taking of the Premises or the Business; or (iii) a cessation of the Permitted Uses for more than a three (3) month consecutive period which conduct of the Permitted Uses is not restored within three (3) months of notice from Draper. "Use and Occupy" shall mean the conduct of the Business for the Permitted Uses consistent with the days and hours of operation of similar businesses.

(d)     i3 Technologies shall not, directly or indirectly, create or permit to be created or to remain, and shall discharge, any mechanic's or other lien placed on the Premises with respect to any work performed by or on behalf of i3 Technologies. i3 Technologies shall pay promptly all persons furnishing labor or materials with respect to any work performed by i3 Technologies. Notwithstanding the foregoing, i3 Technologies shall have the right to contest by appropriate legal proceedings diligently conducted in good faith, in the name of i3 Technologies, or Draper, or both without cost, expense, liability or damage to Draper, the validity or application of any lien. i3 Technologies and any subtenants shall procure unconditional waivers and releases of lien claims (and/or notices of completion) in form reasonably acceptable to Draper from all persons furnishing labor or materials with respect to any work performed on behalf of i3 Technologies on the Premises, at the time each progress payment and/or final payment is made. In the event any mechanic's or other lien shall at any time be filed against the Premises by reason of work, labor, services or materials performed or furnished, or alleged to be performed or furnished, to i3 Technologies or to any one holding the Premises through or under i3 Technologies, i3 Technologies shall, within thirty (30) days of notice of its existence, cause the same to be discharged of

- 4 -

record or bonded to the satisfaction of Draper.  If i3 Technologies fails to cause such lien forthwith to be so discharged or bonded after being notified of the filing thereof, then, in addition to any other right or remedy of Draper, Draper may discharge the same by paying the amount claimed to be due or may cause the same to be bonded, and the amount so paid by Draper, including reasonable attorney's fees incurred by Draper in either defending against such lien or procuring the discharge or bonding of such lien, together with interest thereon at the annual rate provided in Section 22.10 hereof, shall constitute Carry Costs and shall be payable by i3 Technologies to Draper on demand.

ARTICLE 3
Rent

3.1.    Payments Due.  As a condition to the Closing (as defined in the Purchase Agreement), i3 Technologies has paid to Draper $1,599,999.00 on or prior to the Commencement Date and shall thereafter pay to Draper $16,666.67 on the last day of each of the sixty (60) calendar months commencing after the Commencement Date, for a total of $1,000,000.00.  The aforesaid sums, whether payable during the Lease Term or thereafter, are collectively referred to herein as the "Rent."

3.2.    Method of Payment.  All payments of Rent, and all other sums due Draper, or third parties if and to the extent sums are required pursuant to this Agreement to be paid by i3 Technologies to third parties, shall be paid in current U.S. exchange by check without intervening endorsement (i) if payable to Draper, at Draper's address set forth at the beginning of this Agreement or such other place as Draper may from time to time direct by written notice (or if requested by Draper, following reasonable advance notice accompanied by appropriate instructions, by electronic fund transfer) or (ii) if payable to a third party, such as to a tax assessing authority or utility provider, to its proper address for payment, in each case without notice, demand, set-off, counterclaim or other deduction.  Rent not paid within five (5) days of when due shall bear interest payable to Draper at an annual rate as provided in Section 18.9 hereof.  i3 Technologies may pay off the Lease at any time without penalty.

For purposes of this Agreement, all monetary amounts to be paid by i3 Technologies pursuant to the terms of this Agreement, and whether characterized as Rent, shall be treated for remedies purposes as if it were Rent hereunder, it being the intention of the parties hereto that Draper shall have the right to exercise all rights and remedies as a landlord under this Agreement for the non-payment of Rent when due that Draper has hereunder.

Without limiting the foregoing, except as and to the extent expressly otherwise provided in this Lease, i3 Technologies' obligation so to pay Rent shall not be discharged or otherwise affected by any applicable Law now or hereafter applicable to the Premises, or any other restriction on or interference with the Permitted Uses, or any damage or destruction of the Premises including, or any taking, or any other interruption or occurrence whatsoever.

3.3.    Rent Net to Draper.  Rent shall be absolutely net to Draper so that this Agreement shall yield to Draper the full amount of Rent without deduction and free of any charges, assessments, Impositions (as hereinafter defined in Article 4) or deductions of any kind charged, assessed, or imposed on or against the Premises or its use, and without abatement, deduction or set-off by i3 Technologies, and Draper shall not be expected or required to pay any such charge, assessment or Imposition, or be under any obligation or liability hereunder except as herein expressly set forth, and all costs, expenses and obligations of any kind relating to the maintenance and operation of the Premises, including all alterations, repairs, reconstruction and replacements as provided in this Lease, that may arise or become due during the Lease Term shall be paid by i3 Technologies, and Draper shall be indemnified and saved harmless by i3 Technologies from and against such costs, expenses and obligations.

- 5 -

ACTIVE/93287138.7

3.4.    Carry Costs. From and after the Commencement Date, i3 Technologies shall also pay without abatement, deduction or set-off as additional consideration ("Carry Costs"), all sums, Impositions (as defined in subsection 4.1), costs, expenses and other payments which i3 Technologies in any of the provisions of this Lease assumes or agrees to pay and for which Draper shall have (in addition to all other rights and remedies) all the rights and remedies as landlord under the Lease provided for herein or by law or in equity. Carry Costs allocable to a period of time as distinguished from usage (e.g. real estate taxes as distinguished from utilities) for any partial month at the beginning of the Lease Term shall be prorated and i3 Technologies shall only be liable for the portion of such Carry Costs attributable to the period from and after the Commencement Date. To the extent any Carry Costs have been paid by Draper prior to the Commencement Date that pertain to a period or periods extending past the Commencement Date, i3 Technologies shall reimburse Draper promptly on receipt of an invoice from Draper for the pro-rata portion of the Carry Costs attributable to the period from and after the Commencement Date.

3.5.    No Release of Obligations. (a) No happening, event, occurrence or situation during the Lease Term, whether foreseen or unforeseen, and however extraordinary shall permit i3 Technologies to quit or surrender the Premises or the Lease or shall relieve i3 Technologies from its liability to pay the Rent and other charges due under the Lease, or shall entitle i3 Technologies to any abatement or refund of any Rent, or shall relieve i3 Technologies from any of its other obligations under the Lease, and (b) i3 Technologies waives any rights now or hereafter conferred upon, to the extent permitted by law, to quit or surrender the Premises leased hereunder, or any part thereof, or to any abatement, set-off, reduction or suspension of Rent on account of any such act, happening, occurrence or situation, except as otherwise provided herein.

3.6.    Deed to Secure Obligations. i3 Technologies' obligations under this Agreement shall be secured pursuant to a leasehold mortgage in a form reasonably acceptable to Draper and i3 Technologies, to be filed with the appropriate state and county registries in the State of Florida.

ARTICLE 4
Real Estate Taxes

4.1.    Impositions. i3 Technologies covenants to pay, directly to the appropriate Governmental Authority or to the appropriate party, before any fine, penalty, interest or cost may be added thereto for the nonpayment thereof, any and all taxes and amounts  hereafter payable under any agreement for payments in lieu of taxes, assessments (including, but not limited to, all assessments for public improvements or benefits), water, sewer and other rents, rates and charges, charges for public utilities, excises, levies, licenses and permit and inspection fees and other charges (imposed by a Governmental Authority or otherwise), general and special, ordinary and extraordinary, foreseen and unforeseen, of any kind and nature whatsoever, which at any time are assessed, levied, confirmed, imposed upon, or grow or become due or payable out of or in respect of, or become a lien on (a) the Premises, or (b) any payments reserved or payable hereunder or any other sums payable by i3 Technologies hereunder, or (c) the Lease or the leasehold estate hereby created, or which arise in respect of the operation, possession, occupancy or use of the Premises (all of which taxes, payments in lieu of taxes, assessments, charges, interest, penalties or like charges are sometimes hereinafter referred to collectively as "Impositions" and individually as an "Imposition"); provided, however, that:

(i)     If, by law, any Imposition is or may be payable, at the option of the taxpayer, in installments, i3 Technologies may pay such Imposition in installments (with any accrued interest due and payable on the unpaid balance of the Imposition) and shall pay each such installment as the same respectively becomes due and before any fine, penalty, further interest or cost may be added thereto.

- 6 -

        (ii)    For avoidance of doubt, any taxes due under Florida law on the Rent paid hereunder shall be paid by i3 Technologies, not Draper.

    4.2.    <u>Impositions Assessed Against Draper</u>. Nothing herein contained shall require i3 Technologies to pay income taxes assessed against Draper, or any capital levy, corporation franchise, excess profits, estate, succession, inheritance or transfer taxes of Draper, unless such taxes are imposed or levied upon or assessed as a total or partial substitute for, or in lieu of, any other Imposition required to be paid by i3 Technologies pursuant to this <u>Article 4</u>, in which event, the same shall be deemed Impositions and shall be paid by i3 Technologies; provided, however, that if at any time during the Lease Term, the method of taxation shall be such that there shall be levied, assessed or imposed on Draper a capital levy, gross receipts or other tax on the Rent received hereunder and/or a franchise tax or an assessment, levy or charge measured by or based, in whole or in part, upon such Rent, upon the Premises or the Business (including but not limited to the acquisition, leasing, use or value thereof), and/or measured in whole or in part by Draper's income from, or use of, the Premises, then all such taxes, assessments, levies and charges, or the part thereof so measured or based, shall be deemed to be included within the term "Impositions" for the purposes hereof and i3 Technologies shall pay and discharge the same as herein provided in respect of the payment of Impositions.

    4.3.    <u>i3 Technologies' Failure to Promptly Pay Impositions</u>. i3 Technologies shall pay all Impositions before any fine, penalty, interest or cost may be added thereto for the nonpayment thereof, and, with respect to real estate taxes only, shall furnish to Draper, within thirty (30) days of a written request by Draper, with receipts or other satisfactory proof evidencing payment of such real estate taxes.

    4.4.    <u>Validity of Impositions</u>. i3 Technologies shall have the right to contest the amount or validity, in whole or in part, of any Imposition by appropriate proceedings diligently conducted in good faith, but only after payment of such Imposition, unless such payment would operate as a bar to such contest or interfere materially with the prosecution thereof, in which event, notwithstanding the provisions hereof, i3 Technologies may postpone or defer payment of such Imposition if, but only if (i) neither the Premises or Business nor any part thereof would by reason of such postponement or deferment be in danger of being forfeited or lost, and (ii) i3 Technologies shall have provided Draper with evidence that the amount so contested and unpaid, together with all interest and penalties in connection therewith and all charges that may or might be assessed against or become a charge on the Premises or the Business or any part thereof, in such proceedings has been set aside in a separate bank account and earmarked for such purposes upon such arrangements as are reasonably satisfactory to Draper. i3 Technologies will save Draper harmless from any and all losses, liabilities, claims, judgments, decrees and costs, including Legal Costs, in connection with any such contest and will, promptly after the final settlement, compromise or determination of such contest, fully apply and discharge the amounts which shall be levied, assessed, be payable thereon or in connection therewith, together with all penalties, fines, interest, costs and expenses thereof or in connection therewith.

ARTICLE 5<br>Insurance

    5.1.    <u>Liability, Hazard and Other Insurance</u>.

    (a)    i3 Technologies will, at all times until the Agreement Expiration Date, maintain, or cause to be maintained, insurance on the Premises of the following character:

        (i)    Insurance against loss or damage by fire, vandalism and malicious mischief, extended coverage perils and all physical loss perils commonly known as "All Risk" (including earthquake coverages if the same is available at commercially reasonable rates), as shall from

- 7 -

time to time be customary for similarly situated premises in The State of Florida, with a replacement cost coverage endorsement, an agreed amount endorsement waiving all co-insurance provisions of the policy or policies in question, and in an amount not less than one hundred percent of the replacement value of the Premises (excluding foundation(s)), without any deduction being made for depreciation and with a deductible not to exceed $50,000. Such replacement value shall be determined by the company issuing the insurance policy at the time the policy is initially obtained and shall be evidenced by an agreed amount endorsement.

(ii)      Commercial general liability insurance on an occurrence basis insuring i3 Technologies against claims for bodily injury, death, or property damage occurring on, in, or about the Premises, or in connection with i3 Technologies' use and occupancy of the Premises, such insurance to be in standard form and with such coverages and in such amounts as Draper shall reasonably request pursuant to Section 5.1(a)(vii) (but in any event initially with a general aggregate limit of not less than $5,000,000, a products – completed operations aggregate limit of not less than $5,000,000, a personal and advertising injury limit of not less than $1,000,000, and a per occurrence limit of not less than $5,000,000 for bodily injury, property damage and medical payments, which may be based upon a combination of primary coverage of not less than $1,000,000 plus umbrella coverage, which policy shall include operations and contractual liability coverage which insures performance by i3 Technologies of the indemnity provisions set forth in Section 5.2 of this Lease. Draper shall be named as an additional insured under this policy.

(iii)     Adequate boiler and pressure vessel insurance on all equipment, parts thereof, and appurtenances attached or connected to the Premises, which by reason of their use or existence are capable of bursting, erupting, collapsing, or exploding, in such limits as may be reasonably acceptable to Draper.

(iv)     During the course of any construction, repair, restoration or replacement of the Premises, builder's risk insurance (or such reasonably comparable insurance) on an all-risk basis (including collapse) in an amount equal to 100% of the value of the Premises with "increased cost of construction" endorsement and shall insure against the perils of fire and extended coverage and physical loss or damage, including without duplication, coverages with respect to casualties arising due to subsurface work, shoring, blasting, pile driving, caisson work and the like, loss or damage to the equipment, supplies and materials furnished and stored, and owned and non-owned vehicle liability insurance with respect to all vehicles and registered mobile equipment and with respect to any unlicensed mobile equipment, written on a completed value, non-reporting form.

(v)      Broad form flood insurance if any portion of the Premises is currently or at any time in the future located in an area identified by the Secretary of Housing and Urban Development, or any successor agency, as an area having special flood, mudslide or flood-related erosion hazards and in which flood insurance has been made available under the National Flood Insurance Act of 1968 or the Flood Disaster Protection Act of 1973, as amended from time to time, provided that if broad form flood coverage is not available, such insurance shall be for the lesser of the replacement value of the Premises or the maximum amount available under the National Flood Insurance Program.

(vi)     If required by Laws, worker's compensation insurance for all persons engaged by i3 Technologies or any contractor or subcontractor to conduct any activities at the Premises, subject to the statutory limits in the State of Florida, and employers liability insurance with a limit of at least $1,000,000 per accident and per disease per employee, and $1,000,000 per disease policy limit.

- 8 -

(vii)    Such other insurance reasonably required by Draper and customarily carried by i3 Technologies of similar property in similar businesses, or increased amounts of the insurance referred to in (i) – (vi) above (based on changed circumstances, including the declining value of the dollar), that Draper may reasonably request, but not to exceed the level of coverage for such insurance commonly carried by comparable business similarly situated, as reasonably determined by Draper.

(b)    Such insurance shall be written by companies of recognized financial standing which are rated "A" or "A-" by a national rating agency and are legally qualified to issue such insurance in The State of Florida, and such insurance shall name i3 Technologies as the insured party thereunder. Such insurance may be obtained by i3 Technologies by endorsement on its blanket insurance policies if applicable, provided that (i) such blanket policies satisfy the requirements specified herein, and (ii) Draper shall be furnished with the certificate of the insurer to the effect that (A) the amount of insurance allocable exclusively to the Premises is not less than the amount required by this Article and (B) the protection afforded the Premises is not less than the protection that would have been afforded under a separate policy or policies relating only to the Premises. All insurance policies to be maintained hereunder shall require thirty (30) days advance written notice to Draper prior to cancellation, material modification or expiration of such policies.

(c)    i3 Technologies has, as of the Commencement Date, delivered to Draper certificates of insurance satisfactory to Draper evidencing all the insurance which is then required to be maintained by i3 Technologies hereunder, and i3 Technologies shall deliver to Draper no later than sixty (60) days after the Commencement Date the original or duplicate policies satisfactory to Draper evidencing all the insurance which is then required to be maintained by i3 Technologies hereunder; in addition, i3 Technologies shall, within thirty (30) days prior to the date of expiration of any such insurance, deliver either original or duplicate policies or certificates of insurance (followed within sixty (60) days thereafter by delivery of the extension of the policies) evidencing the renewal of such insurance. Should i3 Technologies fail to effect, maintain, or renew any insurance provided for herein, or to pay the premium therefor, or to deliver to Draper any of such policies or certificates when required hereunder, Draper, at its option, but without obligation so to do, may procure such insurance, and any sums expended by it to procure such insurance shall be Carry Costs hereunder and shall be repaid by i3 Technologies within thirty (30) days following the date on which demand therefor shall be made by Draper. i3 Technologies' insurance policy(ies) shall contain a provision that such policy(ies) shall not be canceled, modified or reduced in scope, and shall not expire, without thirty (30) days prior written notice to Draper.

5.2.    Indemnity. To the extent such provision is enforceable at law and except to the extent arising as a result of the negligence or willful misconduct of Draper, i3 Technologies will indemnify and hold harmless Draper (including for purposes of this Section 5.2, Draper's officials, employees, agents, contractors and representatives) from and against any and all liability, loss, damages, expenses (including Legal Costs), costs of action, suits, interest, fines, penalties, claims, and judgments arising from injury, or claim of injury, during the Lease Term to person or property of any and every nature, and from any matter or thing, arising from any act or failure to act by i3 Technologies with respect to the Premises including, without limitation, the buildings and other improvements situated on the Land (including the facilities and fixtures), the operation of the Business, the occupation, possession, use, management, improvement, construction, alteration, repair, maintenance, control or leasing of the Premises including, without limitation, the streets, sidewalks, steam tunnels, curbs, and gutters forming a part of the Premises, the appurtenances to the Premises, or the franchises and privileges connected therewith, or arising out of i3 Technologies' failure to perform, fully and promptly, or i3 Technologies' postponement of compliance with, each and every term, covenant, condition, or agreement herein provided to be performed by i3 Technologies. i3 Technologies shall pay the Legal Costs of Draper incurred in connection with any and all suits that may be brought and claims which may be made, against Draper, or in which Draper may be

impleaded with others, whether Draper shall be liable or not, upon any such above-mentioned liability, loss, damages, expenses, costs of action, suits, interest, fines, penalties, claims, and judgments, and i3 Technologies, at i3 Technologies' own cost and expense, shall satisfy, pay, and discharge any and all judgments, and pay any settlements approved by i3 Technologies, that may be recovered against Draper in any such action or actions in which Draper may be a party defendant, or that may be filed against the Premises, or any interest therein, and in the event of the failure of i3 Technologies to pay the sum or sums for which i3 Technologies shall become liable as aforesaid, then Draper may pay such sum or sums, with all interest and charges which may have accrued thereon, and the amount so paid by Draper, together with any Legal Costs, shall be Carry Costs payable by i3 Technologies to Draper within thirty (30) days following the date on which demand therefor shall be made by Draper.  The indemnification provisions set forth in this Section 5.2 shall survive the expiration or earlier termination of this Lease.

5.3.   Waiver of Subrogation.  Each insurance policy obtained by i3 Technologies in connection with this Lease shall include a waiver by the insurer of all rights of subrogation against Draper.

5.4.   Draper's Insurance.  i3 Technologies acknowledges that Draper is not required to procure or maintain insurance of any kind on or with respect to the Premises under this Lease.

ARTICLE 6
Utilities and Services

i3 Technologies shall provide and pay for, as a Carry Cost, directly to the utility provider, all charges by any public authority or public utility for all of i3 Technologies' requirements for utilities and services, including, but not limited to, gas, steam, heat, water, sewer, electricity, telephone or other telecommunication service and the like at the Premises, and service inspections made therefor.  Draper shall have no obligation to provide the Premises with or arrange for the availability of any utilities or services and makes no representations or warranties relating thereto or to the condition of the Premises in any respect.

ARTICLE 7
Repairs and Maintenance; Performance Requirements

7.1   Maintenance. During the Term, Draper agrees reimburse i3 Technologies up to $700,000.00 for reasonable and documented expenses incurred to replace the roof and the chiller on the Premises.  Except as provided in the immediately preceding sentence, i3 Technologies agrees to be solely responsible, at its sole cost and expense, for maintaining the Premises and each and every part thereof throughout the Lease Term, and agrees, without limitation, to: (i) ensure that the Premises are in compliance with Laws; (ii) maintain the Premises in good order and repair in compliance with the terms of this Lease throughout the Lease Term; and (iii) continuously operate the Business until the Agreement Expiration Date.  All work performed by i3 Technologies shall be done in a good and workmanlike manner and in compliance with all applicable Laws.  i3 Technologies shall not permit or commit any nuisance or unlawful conduct. Notwithstanding the foregoing, the parties acknowledge that Draper shall provide certain transitional support services to i3 Technologies as set forth in Schedule 7.1.

7.2   Performance Requirements.  i3 Technologies agrees that it shall use best efforts to make such investments and otherwise take such actions as may reasonably be necessary to ensure that the Business  produces items in sufficient quality and quantity to (i) obtain and maintain a security clearance for the facility; (ii) obtain and maintain ISO certification; and (iii) satisfy quality and scheduling needs of Draper's current and future customers, as set forth in the Subcontract Agreements to be negotiated by the

- 10 -

parties, as defined in the Purchase Agreement.  Draper shall have first priority for any work to be performed in the facility against any other customers' work.

## ARTICLE 8
### Environmental Indemnity

8.1.    Definitions Related to Hazardous Materials.

(a)    For purposes of this Lease, "Hazardous Materials" include and mean substances defined or classified as a "hazardous substance", "hazardous material", "hazardous waste", "pollutant", or otherwise denominated as a regulated or hazardous substance, waste or material, toxic or pollutant in any of the following:  (i) the federal Comprehensive Environmental Response, Compensation and Liability Act of 1980; (ii) the federal Hazardous Materials Transportation Uniform Safety Act of 1990; (iii) the federal Toxic Substances Control Act; (iv) the federal Resource Conservation and Recovery Act; (v) any present and future federal, state and local laws, statutes, ordinances, rules, regulations and the like, as well as common law, relating to the protection of human health or the environment from Hazardous Materials, relating to liability for or costs of other actual or threatened danger to human health or the environment (collectively, the "Environmental Laws").  "Hazardous Materials" shall specifically include, but not be limited to, oil, asbestos, explosives, polychlorinated biphenyls, petroleum and petroleum-based derivatives, radon and urea formaldehyde.

(b)    "Remedial Work" as used in this Article 8 shall mean investigations, assessments, monitoring, response actions, remedial actions or interim cleanup actions relating to known or suspected Hazardous Materials.

8.2.    Release of Hazardous Materials.  i3 Technologies, for itself and its subtenants and each of their respective agents, employees, consultants, subconsultants, contractors, subcontractors, affiliates and invitees and anyone claiming by or through any of them (such parties other than i3 Technologies being referred to as "i3 Technologies' Agents") covenants and agrees during the Lease Term (i) not to release or dispose of Hazardous Materials, or allow any threat of release of any Hazardous Materials, at, on, under, to or from the Premises in violation of any Environmental Laws; (ii) except where incidental to Permitted Uses and managed, generated, used, stored and transported in compliance with the Environmental Laws and so as not to constitute a release or threat of release to the environment of any Hazardous Materials, not to allow the manufacture, treatment, storage or presence of any Hazardous Materials at the Premises, or transportation of any Hazardous Materials from or onto the Premises; (iii) to comply with the Environmental Laws with respect to the Premises, and (iv) to perform and pay for all Remedial Work required under the Environmental Laws or reasonably necessary for the Permitted Uses to address any Hazardous Materials.

8.3.    Indemnity.  i3 Technologies agrees to indemnify and hold Draper and its employees, contractors, representatives and agents harmless from any costs (including Legal Costs), claims, judgments, damages, penalties, fines, liabilities or losses of every nature and kind whether at law or in equity arising, out of or in any way relating to the presence, release, transportation, treatment, migration, storage or disposal of Hazardous Materials on or relating to the Premises as a result of i3 Technologies' activities (including without limitation all such persons claiming by, through or under i3 Technologies) on or operations on the Premises ("i3 Technologies' Indemnity").  i3 Technologies' Indemnity shall specifically cover, without limitation, the following:  Remedial Work, consultants' fees, response costs, potentially responsible party group costs, investigation and defense costs, and experts' fees; all costs and damages, including natural resource damages, in connection with requirements or claims of any Government Authority or in connection with Third Party Claims, including sums paid in settlement of

ACTIVE/93287138.7

claims, regardless of whether any of such requirements or claims prove true or warranted; all costs of the enforcement of i3 Technologies' obligations hereunder.

i3 Technologies' Indemnity shall survive the expiration or termination of this Agreement or any transfer of all or any portion of the Premises, or of any interest in this Agreement.

8.4.    Draper's Right to Inspect.  To the extent required by any Governmental Authority or by any applicable Laws, Draper and its officers, employees, contractors or agents shall have the right, but not the duty following reasonable advance notice of no less than seven (7) business days (except in the case of an emergency), to enter upon the Premises from time to time for the purposes of inspections and other actions required in order to comply with applicable Laws.  Draper shall not be liable to i3 Technologies in any manner for any expense, loss or damage occurring by reason of the aforesaid entries, nor shall the exercise of any such right be deemed an eviction or disturbance of i3 Technologies' use or possession, provided that, subject to the terms and provisions of the matters set forth on Schedule 1.1 hereto, Draper shall make all reasonable efforts to coordinate such entry so as to minimize any adverse impact to i3 Technologies' normal operations at the Premises.

ARTICLE 9
Assignment, Letting and Mortgaging

9.1.    Letting.  i3 Technologies may not sublet all or any portion of the Premises during the Lease Term, ("letting"), without the prior written consent of Draper which consent shall not be unreasonably withheld, conditioned or delayed.  If consent is granted, the condition to such a transaction would include at a minimum, the proviso that (i) such transaction complies with all of the provisions of this Article 9; (ii) the proposed transaction is in all respects consistent with, and in accordance with, this Agreement, including without limitation Section 2.1 hereof and (iii) the following information and documentation is provided to Draper at least thirty (30) days prior to the effective date of the proposed letting:

A.    The name of the proposed occupant and a copy of the proposed form of the letting agreement (with a duly executed copy to promptly follow upon execution thereof);

B.    Evidence that the proposed occupant's business is in compliance with the Permitted Uses of the Premises;

C.    Evidence that the proposed occupant is able to comply with the performance standards of the Subcontracts and Article 7 of this Agreement; and

D.    Certificates of Good Standing (or certificates of qualification to do business in the State of Florida if such subtenant is a foreign entity) of the proposed subtenant issued by the Secretary of the State of Florida.

In the event of any letting of all or any portion of the Premises, it shall be a condition that the occupant agree in writing with Draper that the occupant will not breach, nor cause i3 Technologies to breach, any of the provisions of this Agreement.  Furthermore, any such letting shall not relieve i3 Technologies of its obligations under this Agreement.  Finally, it shall be a condition of any such letting that:  (i) each transaction document shall be subject and subordinate to this Agreement and the rights of Draper hereunder; (ii) any violation of any provision of this Agreement, whether by act or omission by any occupant shall be deemed a violation of such provision by i3 Technologies, it being the intention and meaning of the parties that i3 Technologies shall assume and be liable to Draper for any and all acts and omissions of any and all occupants with respect to this Agreement, provided, that this Agreement shall

- 12 -

ACTIVE/93287138.7

not be terminated due to default of any occupant so long as such default does not constitute or result in an Event of Default under this Agreement; (iii) each such letting shall provide that in the event this Agreement is terminated prior to the expiration of such sublease, then at Draper's option, the occupant thereunder will either attorn to Draper and waive any right the occupant may have to terminate the sublease, or surrender possession thereunder as a result of the termination of this Agreement, and the sublease shall terminate simultaneously with the termination or expiration of the Lease; and (iv) the proposed occupant shall become subject to the obligations of i3 Technologies under the Purchase Agreement. No letting shall affect the Permitted Uses. Any attempted letting in violation of the terms of this Article 9 shall be void. i3 Technologies shall not directly or indirectly collect or accept any payment of rent under any letting for any period in excess of thirty (30) days in advance.

9.2.    Assignment and Mortgaging.  i3 Technologies or its assignee shall not, directly or indirectly, assign or otherwise transfer its interest in the Premises or under this Agreement without Draper's prior written consent, which may be withheld or granted in Draper's sole and absolute discretion.

9.3.    Expenses of Draper.  i3 Technologies shall pay all expenses incurred by Draper, including reasonable attorneys' fees and disbursements, in connection with any request by i3 Technologies for consent by Draper to exercise rights under this Article 9.

ARTICLE 10
Casualty Damage

10.1.    Restoration.

(a)    In the event of a casualty to the Premises which does not materially disrupt the business operations of i3 Technologies, then in that event i3 Technologies  will, at i3 Technologies' sole cost and expense, and with all due diligence, and without regard to the coverage, amount or availability of proceeds of any insurance, shall restore, repair, replace, rebuild or relocate the Premises so that the condition of the Premises is comparable to the condition of the Premises prior to the casualty.

(b)    In the event of a casualty to the Premises which causes a material disruption to the business operations of i3 Technologies, then in that event i3 Technologies, Inc. shall have the option, at its sole discretion, of paying Draper the remaining unpaid Rent and terminating the lease with Draper, provided only that it also makes a decision neither to restore or relocate in the State of Florida. If i3 Technologies, however, chooses to restore or relocate in the State of Florida, then it will consult with Draper about the choice between restoration at the current site or relocation otherwise in Florida. After such consultation, i3 Technologies will make a decision and shall restore, repair, replace, rebuild or relocate the Premises to the extent reasonably necessary for the Permitted Uses, subject to the receipt of any approvals required to effectuate such restoration and compliance of this Agreement. i3 Technologies shall maintain sufficient insurance coverage so that restoration or relocation in the State of Florida is funded thereby. (Such repairs or restoration, including any changes and alterations and including temporary repairs, are referred to in this Section 10.1 as the "Restoration Work".)  Prior to the commencement of any such reconstruction, i3 Technologies shall provide Draper with documentation to substantiate funds available to return the Premises to a safe and buildable condition with all structures and other improvements removed from the Premises, unless otherwise agreed upon by the parties. In the event of total or significant casualty to the Premises, upon completion of the Restoration Work or the relocation costs any insurance proceeds net of the costs will be paid (i) first, to Draper to the extent of any remaining unpaid Rent, (ii) thereafter to i3 Technologies into escrow to be applied to any other Carry Costs due up to the Agreement Expiration Date, and (iii) any remaining proceeds, following the

- 13 -

Agreement Expiration Date, to i3 Technologies. If the cost of the relocation or Restoration Work exceeds the amount of the insurance proceeds, the deficiency shall be paid by i3 Technologies.

 10.2. <u>Conditions of Work</u>. Except as otherwise provided in this <u>Article 10</u>, the conditions under which any Restoration Work is to be performed and the method of proceeding with and performing the same shall be governed by all of the provisions of <u>Article 16</u>.

ARTICLE 11
<u>Eminent Domain and Public Dedication</u>

 11.1. <u>Total, Partial Taking; Termination of Lease</u>. If, prior to the Agreement Expiration Date, there is any taking of all or any part of the Premises or any interest in the Lease (if during the Lease Term) by (i) the taking or condemnation by any public or quasi-public authority, or private corporation or individual having the power of condemnation ("<u>Condemnor</u>") of the title to or the possession or use of all or part of the Premises by virtue of eminent domain or for any public or quasi-public use and (ii) a voluntary sale or transfer by Draper to any Condemnor, either under threat of condemnation or while legal proceedings for condemnation are pending ("<u>Condemnation</u>"), the rights and obligations of Draper and i3 Technologies shall be as follows:

 11.1.1 <u>Total Taking</u>.

 If title to the whole or substantially all of the Premises shall be taken by Condemnation, this Agreement shall terminate and expire on the date of such Condemnation subject to and in accordance with this <u>Article 11</u>, except that, if not reduced or eliminated due to i3 Technologies seeking a real estate tax abatement proceeding in accordance with applicable Laws, i3 Technologies shall pay the Impositions due as of the date of the Condemnation.

 11.1.2 <u>Partial Taking</u>.

 If title to less than the whole or substantially all of the Premises shall be taken by Condemnation and the portion of the Premises remaining is not of a size to permit the Premises to be used for the Permitted Uses with the amount of the total compensation, sums or anything of value awarded, paid or received in a total or a partial Condemnation Award (an "<u>Award</u>") available therefor so as to constitute the same economic value and usefulness as immediately before such Condemnation, i3 Technologies or Draper may, at their option, terminate this Agreement subject to and in accordance with this <u>Article 11</u> within ninety (90) days after such condemnation by serving upon the other party at any time within said ninety (90) day period, a thirty (30) day written notice of such party's election to so terminate accompanied by a certificate of such party showing, in detail, that the remaining portion of the Premises are not of a size to permit the Premises to be used for the Permitted Uses so as to constitute the same usefulness as immediately before such Condemnation.

 11.1.3 <u>Distribution of Award</u>. In the event of a Condemnation and the termination of this Agreement, the Award shall be distributed according to the following:

 (a) First, to Draper in the amount of the outstanding amount of all Rent due under this Agreement;

 (b) Second, to i3 Technologies in the amount of any remaining Award proceeds.

 11.2. <u>Partial Taking - Lease Continues</u>. In the event of a Condemnation that does not result in a termination of this Agreement, the Lease Term shall not be reduced or affected in any way and this

- 14 -

Agreement shall remain in full force and effect. i3 Technologies shall, after any such Partial Taking, and at its sole cost and expense, repair or cause the repair of any damage caused by such Partial Taking in conformity with the requirements contained or referred to in <u>Section 10</u> hereof as to restoration after a casualty, or at i3 Technologies' option make the Premises safe and buildable, so that the Premises will be in compliance with the standards contained in said <u>Section 10</u>. (Such repairs or restoration, including any changes and alterations and including temporary repairs, are referred to in this <u>Section 11.2</u> as the "Work".) Upon completion of such restoration, any remaining portion of the Award will be paid (i) first, to Draper to the extent of any remaining unpaid Rent, (ii) thereafter to i3 Technologies into escrow to be applied to any other Carry Costs due up to the Agreement Expiration Date, and (iii) any remaining Award proceeds, following the Agreement Expiration Date, to i3 Technologies. If the cost of the Work exceeds the amount of the Award, the deficiency shall be paid by i3 Technologies.

11.3.   <u>Restoration of the Premises</u>. In the event of a Condemnation which does not result in a termination of this Lease and this Lease is otherwise in full force and effect, i3 Technologies, at its sole cost and expense shall proceed with reasonable diligence and continuously to repair and restore the remaining part of the Premises to a condition sufficient for the Permitted Uses and so as to be in compliance with all Laws.

11.4.   <u>Abatement of Rent</u>. Unless otherwise mutually agreed upon in writing by the parties, there shall be no adjustment or abatement of Rent as a result of a Condemnation.

11.5.   <u>Temporary Taking</u>. If the whole or any part of the Premises or of i3 Technologies' interest in this Lease shall be taken by Condemnation for a temporary use or occupancy, the Lease Term shall not be reduced or affected in any way and i3 Technologies shall be liable for all obligations under this Lease, including the payment of the Rent, without reduction or abatement, in the manner and at the times herein specified and, except only to the extent that i3 Technologies is prevented from so doing pursuant to the terms of the order of the Condemnation, i3 Technologies shall continue to perform and observe all of the other covenants and agreements hereof as though such Condemnation had not occurred. In the event of any such Condemnation for a temporary use or occupancy, i3 Technologies shall be entitled to receive the entire amount of any Award whether such Award is paid by way of damages, rent or otherwise, unless such period of temporary use or occupancy shall extend beyond the Lease Term in which case such Award, after payment to Draper therefrom of the estimated cost of restoration of the Premises to the extent that the Award is intended to compensate for damages to the Premises (unless i3 Technologies restores the Premises in which event such portion of the Award attributable to the cost of restoration shall be the property of i3 Technologies), shall be apportioned by Draper and i3 Technologies as of the termination date in the same ratio that the part of the entire period for which such compensation is made falling before the termination date and that part falling after, bear to such entire period.

11.6.   <u>Rights of Participation</u>. Each party shall have the right, at its own expense, to appear in a Condemnation proceeding and to participate in any and all hearings and trials.

11.7.   <u>Notice of Proceeding</u>. In the event Draper or i3 Technologies shall receive notice of any proposed or pending Condemnation affecting the Premises, the party receiving such notice shall promptly notify the other party of the receipt and contents thereof.

ARTICLE 12
<u>No Broker Representation</u>

i3 Technologies represents and warrants to Draper that i3 Technologies has not dealt with any broker or other person who might be entitled to a commission or similar fee in connection with the Lease or any transaction contemplated hereby or referred to herein. i3 Technologies hereby agrees to indemnify

- 15 -

Draper and to hold it harmless from and against any and all loss, liability, claim, cost or expense (including Legal Costs) arising from a breach of the aforesaid representation of i3 Technologies.

Draper represents and warrants to i3 Technologies that Draper has not dealt with any broker or other person who might be entitled to a commission or similar fee in connection with the Lease or any transaction contemplated hereby or referred to herein. Draper hereby agrees to indemnify i3 Technologies and to hold it harmless from and against any and all loss, liability, claim, cost or expense (including Legal Costs) arising from a breach of the aforesaid representation of Draper.

## ARTICLE 13
### Quiet Enjoyment

Draper agrees that, during the Lease Term, if i3 Technologies shall pay the Rent and Carry Costs and perform, fulfill and observe the other obligations and liabilities of i3 Technologies herein, subject to i3 Technologies' available notice and cure rights hereunder, i3 Technologies shall peacefully and quietly have, hold and enjoy the Premises as lessee without any manner of hindrance or molestation by Draper or anyone lawfully claiming by, through or under Draper, subject to all of the provisions of this Agreement.

## ARTICLE 14
### Surrender of Premises

Upon any termination of the Lease prior to acquisition by i3 Technologies of the fee interest in the Premises pursuant to Article 19 below, or eviction following foreclosure of any mortgage given by i3 Technologies to Draper pursuant to Article 19, i3 Technologies shall quit and surrender to Draper the Premises, broom clean, in good order and condition, reasonable wear and tear excepted, and i3 Technologies shall remove all of its movable personal property therefrom, including all equipment specific to the Permitted Uses by i3 Technologies that were purchased by i3 Technologies after the Commencement Date (excluding the buildings and other improvements situated thereon, which shall remain on the Land).

## ARTICLE 15
### Default

15.1.   Events of Default. An "Event of Default" shall occur:  (a) if i3 Technologies shall neglect or fail to perform any of the monetary covenants, terms and provisions contained in this Agreement on i3 Technologies' part to be performed or observed as of the due date therefor; provided however that an Event of Default shall not be deemed to have occurred until ten (10) days after i3 Technologies shall have received notice from Draper that such monetary covenant, term or provision has not been complied with and continues uncured after the expiration of such ten (10) day period, or (b) if a default be made by i3 Technologies in the performance or observance of any of the covenants, terms or provisions contained in Sections 9.1 or 9.2, or (c) if i3 Technologies shall neglect or fail to perform its obligations under Article 5 to effect, maintain or renew any insurance coverages provided for in Article 5 within three (3) business days after receipt of notice of default from Draper, or (d) if i3 Technologies shall neglect or fail to perform any of the other non-monetary covenants, terms or provisions contained in this Agreement on i3 Technologies' part to be performed or observed within thirty (30) days after receipt of notice of default from Draper, or such additional time beyond said 30-day period after receipt of notice of default from Draper, as may be reasonably required to correct any non-monetary default, provided, in connection with any cure period exceeding thirty (30) days, that i3 Technologies is diligently and continuously pursuing a timely cure for such non-monetary default and such non-monetary default is of a nature which is susceptible of cure and is not of a nature which could result in criminal sanctions or a forfeiture of Draper's interest in the Premises and does not constitute a threat to public health or safety as

- 16 -

reasonably determined by Draper which has not been addressed by i3 Technologies securing the Premises and making the Premises safe such that, in Draper's judgment reasonably exercised, no such threat exists, provided however that in the event that Draper has determined that such threat to public health or safety exists at the Premises and i3 Technologies claims that such threat cannot be addressed and rectified by i3 Technologies because of the existence of an event constituting Force Majeure affecting only i3 Technologies, then i3 Technologies shall notify Draper of same and Draper shall then have the right, but not the obligation, to address and rectify such threat, with the costs thereof, including Legal Costs, to be paid by i3 Technologies in advance, or (e) if i3 Technologies' estate shall be sold upon execution or if i3 Technologies shall be adjudicated bankrupt or insolvent, or if a receiver, trustee, or liquidating officer shall be appointed with respect to the Premises and is not discharged within ninety (90) days after appointment, or if i3 Technologies shall make an assignment for the benefit of its creditors by trust mortgage, or otherwise, or if i3 Technologies shall file a voluntary petition in bankruptcy or insolvency under any bankruptcy or insolvency law now in force or hereafter enacted (Federal, State, or otherwise), or if any such petition shall be filed involuntarily against i3 Technologies and if such petition shall not be discharged within ninety (90) days after its filing.

      15.2.   Indemnity and Hold Harmless Provision. If an Event of Default shall occur, without limiting any other rights or remedies Draper may have at law or in equity (Draper expressly reserving the right to injunctive relief and/or specific performance) or under this Agreement, i3 Technologies shall indemnify and hold Draper harmless from all loss of Rent damages, costs (including Legal Costs), and expenses which Draper may incur from time to time by reason of the occurrence of the Event of Default, together with interest on any unpaid Rent at an annual rate which shall be as provided in Section 18.9 hereof from the date on which the same shall be first due and payable, upon demand of Draper until the date paid.

      15.3.   Draper's Right to Repossess during Lease Term. Should any Event of Default occur during the Lease Term, then, notwithstanding any former breach of covenant or waiver of the benefit hereof or consent in a former instance, Draper lawfully may, in addition to any and all rights and remedies otherwise available to Draper at law, in equity, and under the Lease, all of which are cumulative, and which Draper expressly reserves, and which may be exercised by Draper sequentially or concurrently in any order, immediately or at any time thereafter, and without demand or notice, enter into and upon the Premises or any part thereof in the name of the whole and repossess the same as of Draper's former estate, and expel i3 Technologies and those claiming through or under it and remove its or their effects (forcibly if necessary) without being deemed guilty of any manner of trespass, and without prejudice to any rights or remedies which might otherwise be used for arrears of Carry Costs or preceding breach of covenant and/or Draper may send written notice to i3 Technologies terminating the Lease Term; and upon the first of such notice of termination, the Lease Term shall terminate. i3 Technologies covenants and agrees, notwithstanding any termination of the Lease as aforesaid or any entry or reentry by Draper, whether by summary proceedings, termination or otherwise, that i3 Technologies shall be and remain liable for Rent paid to Draper under this Lease (and there shall be no abatement or refund of any portion of the Rent) and the Carry Costs and other charges reserved as they would, under the terms of this Lease, become due if this Lease had not been terminated or if Draper had not entered or re-entered as aforesaid, and whether the Premises be re-let or remain vacant, in whole or in part, or for a period less than the remainder of the Lease Term, and for the whole thereof. Draper shall have no obligation to re-let the Premises and shall have no obligation to mitigate damages upon the occurrence of an Event of Default hereunder. Any such re-letting of the Premises by Draper shall be for the benefit of Draper.

      15.4.   Draper's Right to Possession by Mortgage Foreclosure. If i3 Technologies shall be mortgagee to Draper pursuant to a mortgage given pursuant to Section 19 below, Draper's rights to repossess shall be as described therein.

- 17 -

## ARTICLE 16
## Alterations; No Draper Obligations to Make Optional Improvements

16.1.    Conditions for Making Alterations and Optional Improvements.  i3 Technologies shall have the right to make alterations, additions and changes to the Premises, provided that same are consistent with i3 Technologies' ability to operate the Premises for the Permitted Uses (collectively "Optional Improvements"), on the following terms and conditions:

(a)  Except for Optional Improvements which (i) cost less than $100,000 (subject to adjustment as provided in Section 10.1 hereof), and (ii) do not involve significant structural, mechanical or electrical alterations or alterations, such as the re-arrangement of internal walls of the premises, i3 Technologies shall not undertake construction of any Optional Improvement, including the demolition, erection, addition or material alteration of any building or structure, roadway, walkway, utility, sewer or drain main, exterior sign, parking area, or landscaped area, without furnishing to Draper any construction plans prepared by or on behalf of i3 Technologies in connection with such Optional Improvements, together with a Business certificate reasonably acceptable to Draper from an architect or engineer overseeing the construction of such improvements (the "Business Certificate") that such Optional Improvements are in full compliance with Laws, including the then applicable zoning laws.

(b)  [INTENTIONALLY OMITTED].

(c)  Draper shall have no obligations, responsibilities, liabilities or duties whatsoever with respect to the design, construction, maintenance, repair, management, insurance, safety, alteration or care or compliance with Laws of any of the Optional Improvements or the Premises generally, including without limitation the building and other improvements located on the Premises as of the date hereof, the responsibility for which i3 Technologies hereby expressly assumes.

(d)  No alterations, additions or changes to the Premises shall otherwise be made to the Premises without Draper's prior written consent.

## ARTICLE 17
## Ownership of Improvements

At all times during the Lease Term, (i) Draper shall continue to have title to the Premises and (ii) i3 Technologies shall have title to all new improvements constructed by i3 Technologies upon the Premises, subject to the provisions of this Agreement upon acquisition by i3 Technologies of the same pursuant to Article 19 below.  Upon any termination of the Lease in lieu of the sale of the Premises pursuant to Article 19 below, i3 Technologies shall execute and deliver to Draper, unless Draper has requested and i3 Technologies has completed demolition of the improvements, or i3 Technologies is otherwise required to demolish the improvements in accordance with Article 16 hereof, a bill of sale for all the improvements and fixtures then existing on the Land and owned by i3 Technologies, in form for filing with the Registry.  Draper shall then have the right to file a certificate with the Registry to the effect that the Lease has expired or terminated in accordance with its terms and such certificate shall forever estop i3 Technologies under the Lease or at law or in equity from asserting any rights of i3 Technologies hereunder and upon the filing of such certificate, full title to the improvements then existing on the Premises shall automatically, without more, vest in Draper.

ACTIVE/93287138.7

ARTICLE 18
Miscellaneous Provisions

18.1.   Nondiscrimination.

(a)      i3 Technologies shall not discriminate against any qualified employee, applicant for employment, subcontractor or any person or firm seeking to provide goods or services to i3 Technologies, nor shall i3 Technologies deny any person access to the Premises or to any activities or programs carried out pursuant to this Lease because of the race, color, national origin, ancestry, age, sex, religion, physical or mental handicap, or sexual orientation. i3 Technologies shall comply with all applicable federal and state statutes, rules and regulations prohibiting discrimination in employment.

(b)      i3 Technologies shall give consideration to the extent practicable to encouraging recruitment of minorities, women, disabled persons and Vietnam-era veterans for the Business.

(c)      i3 Technologies shall give consideration to the extent practicable to contacting, encouraging and utilizing minority- and women-owned business enterprises in the procurement of materials and equipment for the Business.

18.2.   Draper's Liability; i3 Technologies' Liability.  No official, employee or consultant of Draper shall be personally liable to i3 Technologies or to any successor in interest or person claiming through or under i3 Technologies in the event of any default or breach of this Agreement, or for any amount which may become due or on any claim, cause or obligations whatsoever under the terms of this Agreement. All claims against Draper shall be governed by the provisions of this Agreement. No officer, director, or employee of i3 Technologies shall be personally liable to Draper or to any successor. No officer, director, or employee of i3 Technologies shall be personally liable to Draper or to any successor in the event of any default or breach of this Agreement, or for any amount which  may become due or on any claim, cause or obligations whatsoever under the terms of this Agreement.

18.3.   Status Report.  Draper and i3 Technologies agree at any time and from time to time, upon not less than fifteen (15) business days prior written request by the other, to execute, acknowledge and deliver to the other a statement in writing certifying that this Agreement is unmodified and in full force and effect (or if there have been modifications, that the same is in full force and effect as modified, and stating the modifications), that either under this Agreement there is no default and no event has occurred which, with the passage of time or the giving of notice or both, would constitute a default, or that a default exists under this Agreement and specifying the nature thereof, the dates to which Rent and other charges have been paid in advance, and such additional items as may be reasonably required.

18.4.   Provisions Binding.  The term "Draper" wherever used in this Agreement shall be deemed to mean the body politic, or the corporation, persons or other legal entity holding the rights of Draper under this Agreement at the time in question, and it is understood and agreed that the covenants and agreements contained herein shall be binding upon Draper and its successors only with respect to breaches occurring during Draper's and Draper's successors' respective ownership of the entire interest of Draper hereunder.  The term "i3 Technologies" wherever used in this Lease shall be deemed to mean the limited liability company, corporation, persons or other legal entity holding the rights of i3 Technologies under this Agreement at the time in question.

i3 Technologies specifically agrees that any recovery to it under this Agreement shall be limited to a maximum amount equal to the value of Draper's interest in the Premises.  In any event it is specifically agreed that neither Draper nor its constituent agencies or other divisions shall ever be liable to i3 Technologies for any such judgment in excess of such maximum amount, and in no event shall Draper

- 19 -

or its constituent agencies or other divisions ever be liable to i3 Technologies for indirect or consequential damages.

Except as set forth above, all of the covenants, agreements, stipulations, provisions, conditions, options and obligations herein expressed and set forth shall be considered as running with the Premises and shall (unless herein otherwise specifically provided) extend to, bind and inure to the benefit of, as the case may require, the successors and assigns of Draper and i3 Technologies, respectively, or their successors in interest, as fully as if such words were written whenever reference to Draper and i3 Technologies occur in this Lease. The reference contained to successors and assigns of i3 Technologies is not intended to include subtenants or to constitute a consent to an assignment by i3 Technologies not otherwise permitted hereunder. In no event shall Draper or i3 Technologies be liable to the other for indirect or consequential damages under this Lease.

18.5.    Invalidity of Particular Provisions. If any term or provision of this Lease or the application thereof to any person or circumstance shall be invalid or unenforceable, the remainder of this Lease, or the application of such term or provision to persons or circumstances other than those as to which it is invalid or unenforceable, shall not be affected thereby, and each term and provision of this Lease shall be valid and shall be enforceable to the fullest extent permitted by law.

18.6.    [INTENTIONALLY OMITTED.]

18.7.    Waiver. No failure by Draper or i3 Technologies to insist upon the strict performance of any provisions, condition or agreement contained in this Lease, to be performed by the other, shall ever be deemed to be a waiver of such provisions as to any subsequent event constituting nonperformance or observance by such party. All waivers shall be in writing, contain the word "waiver", and specifically identify the obligation or other provision of this Lease being waived in order to be effective.

18.8.    Draper's Right of Self-Help. As an additional alternative remedy to the other remedies provided for in this Agreement, Draper shall have the right (but not the obligation) to cure any Event of Default for and on behalf of i3 Technologies (a) relating to i3 Technologies' obligations regarding insurance, maintenance, repair and use of the Premises, or (b) relating to the obligations of i3 Technologies to comply with Laws, including, without limitation, such Laws as are applicable to Hazardous Materials, or (c) relating to the obligations of i3 Technologies to discharge liens (or bond off such liens or otherwise remove them of record), if such default, if not promptly cured, results, or can reasonably be anticipated to result, in a dangerous, unhealthy or unsafe condition at the Premises, or in a forfeiture, condemnation or loss of the interest of Draper in the Premises, provided however that Draper's right of self-help shall not be exercised by Draper prior to providing i3 Technologies with an additional notice of Draper's intention to exercise its right of self-help and, so long as Draper has determined that there is no imminent threat to public health or safety, providing i3 Technologies with an additional cure period, not to exceed seven (7) days. Expenses of Draper incurred in exercising its rights under this Section 18.8, shall be Carry Costs hereunder. Draper shall not incur any liability as a result of any exercise of the rights under this Section 18.8, and i3 Technologies shall indemnify and hold Draper harmless from all costs, claims, losses and liabilities in any way relating to the same, including "Legal Costs" as hereinafter defined in Section 18.15. Any amount payable by i3 Technologies to Draper pursuant to the provisions of this Section 18.8 shall be paid within thirty (30) days of receipt of a bill for such amount from Draper.

18.9.    Interest. All payments becoming due under this Lease and not paid when due shall bear interest from the applicable due date until received by Draper at the lesser of: (i) four percent (4%) per annum above the base rate announced from time to time by Bank of America (or in the event that such

- 20 -

bank ceases to exist to issue such a rate, a comparable rate of a comparable financial institution); or (ii) the maximum annual amount permitted by applicable Law.

18.10.   <u>Amendments</u>.  All negotiations, considerations, representations and understandings among Draper and i3 Technologies are incorporated herein and may be modified or altered only by agreement in writing between Draper and i3 Technologies.

18.11.   <u>Governing Law</u>.  The terms and conditions of the Lease shall be governed exclusively by the provisions hereof and by the substantive laws of The State of Florida, without reference to its conflict of laws provisions.

18.12.   <u>Notices</u>.  Any notice or other communication required or permitted hereunder,  shall be given in writing and delivered by hand, by overnight courier (including Federal Express and similar recognized overnight delivery services) or by express mail or certified mail-return receipt requested, and shall be deemed given or made upon the earlier of (a) the date of service if served personally on the Party to whom notice is to be given; (b) the day of transmission if sent via facsimile transmission to the facsimile number given below, and confirmation of receipt is obtained promptly after completion of transmission; (c) the day of transmission if sent via email to the email address given below, and confirmation of receipt is obtained promptly after completion of transmission; (d) the day after delivery to Federal Express or a similar overnight courier; or (e) the fifth day after mailing, if mailed to the Party to whom notice is to be given, by first class mail, registered or certified, postage prepaid and properly addressed as set forth below, or at any other address that such party may hereafter specify from time to time in writing.

If to Draper:

> The Charles Stark Draper Laboratory, Inc.
> 555 Technology Square
> Cambridge, MA  02139
> Attention: Chief Administrative Officer
> Email: emora@draper.com

> With a copy to the Office of the General Counsel at the same address

Wherever in this Lease notice or requests to Draper must be given in accordance with <u>Section 18.12</u> and a response is required with a specified period of  the envelopes containing the notice or request shall bear on the outside thereof, and the first page of such notice at the top of such page, the following legend, printed in bold-face type in a font of at least 14 points in size:

**NOTICE**
**THIS NOTICE REQUIRES REPLY.**

**WITHIN [ ] DAYS** with the blank in such legend filled in with the number of days for notice or request referred to in the applicable Section of this Lease, as appropriate.

If to i3 Technologies:

> i3 Technologies, Inc.
> 100 Eldredge Street
> Binghamton, NY 13901

- 21 -

Attn: James T. Matthews
Email: jim.matthews@i3electronics.com

18.13.   Force Majeure.  In any case where i3 Technologies is required to do any act other than the payment of money, delays caused by or resulting from Acts of God, war, civil commotion, fire, flood or other casualty, strikes, unavailability of materials or equipment, unusually severe weather or other causes beyond the reasonable control of i3 Technologies shall not be counted in determining the time when the performance of such act must be completed.

18.14.   Survival of Certain Provisions.  Notwithstanding any provision herein to the contrary, the provisions of Section 5.4, Article 3 and Article 8 herein shall survive the expiration or earlier termination of this Lease.

18.15.   "Legal Costs" Defined.  In the event that Draper chooses to be represented by counsel in its sole discretion, i3 Technologies' indemnification and reimbursement responsibilities under any provision of this Agreement, whether incurred in connection with a litigation matter or any other legal matter, shall include all court and litigation costs and alternative dispute resolution costs borne by Draper and reasonable legal fees, court and litigation costs and alternative dispute resolution costs and expenses charged by private counsel employed by Draper, all of which costs and expenses shall be defined herein collectively as "Legal Costs".

ARTICLE 19
i3 Technologies' Purchase of the Premises

19.1.   Purchase of the Premises.

On and as of the fifth anniversary of the Closing Date (or the earlier payoff of all amounts due and owing under this Agreement), *provided* that no Event of Default exists, Draper (or its assigns, as the case may be) shall transfer and convey to i3 Technologies, and i3 Technologies will accept and assume, and the Premises (and any liabilities and obligations related thereto) for consideration of One Dollar ($1.00).  The form of the Special Warranty Deed (the "Deed") for the conveyance shall be substantially in the form attached hereto as Exhibit B.  Draper shall convey title without any liens or encumbrances except for those liens or encumbrances that exist at the time of the execution of this Agreement and except for additional utility easements, covenants or restrictions compatible with the current usage of the Premises.

[REMAINDER OF PAGE LEFT BLANK INTENTIONALLY.

SIGNATURES APPEAR ON FOLLOWING PAGE.]

ACTIVE/93287138.7

WITNESS the execution hereof, under seal, in any number of counterpart copies, each of which counterpart copies shall be deemed an original for all purposes, as of the day and year first above written.

THE CHARLES STARK DRAPER LABORATORY, INC.

By: _____
Name: Elizabeth A. Mora
Title:   Chief Administrative Officer


i3 TECHNOLOGIES, INC.

By: _____
Name: James T. Matthews
Title:   Chief Executive Officer

[Signature page to Real Property Lease]

Exhibit A

Description of Premises

1.  The parcel of land known as Lots 26 and 27, Block C of Metropointe Commerce Park Phase II
    according to the plat thereof recorded in Plat Book 103, Pages 25 and 26 located in the City of St.
    Petersburg, Pinellas County, Florida, containing approximately 2.673 acres of land, located in the
    Industrial Limited (IL) land use designation, and all easements, privileges, hereditaments and
    appurtenances in, on, under or affecting Lots 26 and 27 (but excluding any public streets, ways
    and alleys abutting or adjoining Lots 26 and 27, which public streets, ways or alleys, the Parties
    agree, may be used by i3 Technologies in common with others entitled thereto, for all uses and
    purposes for which public streets, ways and alleys may be used in the City of St. Petersburg, and
    any strips, gores, trees, shrubs and plants thereon.

Exhibit B

Form of Special Warranty Deed

B-1

**Form of Special Warranty Deed**

This Instrument Prepared by:

Grantee's Tax Identification No.:

Property Appraiser's Folio No.:

## SPECIAL WARRANTY DEED

THIS SPECIAL WARRANTY DEED (this "**Deed**") is made as of the _____ day of _____, 20___ from THE CHARLES STARK DRAPER LABORATORY, INC., a Massachusetts non-profit corporation, the mailing address of which is 555 Technology Square, Cambridge, MA 02139 ("**Grantor**") to I3 TECHNOLOGIES, INC., a New York corporation, with an address at 100 Eldredge Street, Binghamton, NY 13901 ("**Grantee**").

## W I T N E S S E T H:

THAT Grantor, for and in consideration of the sum of One and No/100 Dollars ($1.00), and other good and valuable consideration paid to Grantor by Grantee, the receipt of which is hereby acknowledged, by these presents does grant, bargain, sell and convey to Grantee, and Grantee's successors and assigns forever, all the right, title, and interest in and to that certain real property (the "**Property**") located and situate in Pinellas County, Florida and fully described as follows:

SEE **EXHIBIT 1** ATTACHED HERETO AND MADE A PART HEREOF

TOGETHER with all improvements, easements, tenements, hereditaments and appurtenances belonging to or in any way appertaining to the Property.

TO HAVE AND TO HOLD the same in fee simple forever.

GRANTOR hereby specially warrants the title to the Property and will defend the same against the lawful claims of all persons claiming by, through, or under Grantor, but none other.

IN WITNESS WHEREOF, Grantor has duly executed this instrument as of the date first written above.

WITNESSES:                                          GRANTOR:

                                                    _____

Print Name: _____               By:    _____
            _____               Name:  _____
                                                     Title: _____
            _____
Print Name: _____

STATE OF _____        )
                                 )
COUNTY OF _____            )

        The foregoing instrument was acknowledged before me this _____ day of _____,
20____      by      _____,      as      _____ of
_____, a _____, who personally known to me or who
produced _____as identification, on behalf of the company.

My commission expires:

                                 _____
                                 NOTARY PUBLIC, State of _____
                                 Print name: _____

EXHIBIT 1

Legal Description

1.  The parcel of land known as Lots 26 and 27, Block C of Metropointe Commerce Park
    Phase II according to the plat thereof recorded in Plat Book 103, Pages 25 and 26 located
    in the City of St. Petersburg, Pinellas County, Florida, containing approximately 2.673
    acres of land, located in the Industrial Limited (IL) land use designation.

2.  A portion of Lot 28, Block C of Metropointe Commerce Park Phase II according to the
    plat thereof recorded in Plat Book 103, Pages 25 and 26, of the Public Records of Pinellas
    County, Florida being more particularly described as follows:

    Commence at the Southeast corner of Lot 26 of said Block C; thence on the Easterly
    boundary of Lots 26 and 27 of said Block C, North 00°02'40" East, a distance of 300.27
    feet to the POINT OF BEGINNING, said point being the Southeast corner of said Lot 28;
    thence on the Southerly boundary of said Lot 28, South 89°59'40" West, a distance of
    359.93 feet to a point on the Easterly boundary of that certain parcel of land described in
    Official Records Book 12666, Page 901 of the Public Records of Pinellas County,
    Florida; thence on the Easterly boundary of said certain parcel, North 00°00'28" East, a
    distance of 52.39 feet; thence departing said Easterly boundary, South 89°57'20" East, a
    distance of 43.21 feet; thence South 00°02'40" West, a distance of 30.51 feet; thence
    South 89°57'20" East, a distance of 316.75 feet to a point on the Easterly boundary of
    said Lot 28; thence on said Easterly boundary, South 00°02'40" West, a distance of 21.57
    feet to the POINT OF BEGINNING.

3.  All easements, privileges, hereditaments and appurtenances in, on, under or affecting
    Lots 26 and 27 and those portion of Lot 28 described in item 2 above (but excluding any
    public streets, ways and alleys abutting or adjoining Lots 26, 27 and 28, which public
    streets, ways or alleys, the Parties agree, may be used by Aurora in common with others
    entitled thereto, for all uses and purposes for which public streets, ways and alleys may
    be used in the City of St. Petersburg, and any strips, gores, trees, shrubs and plants
    thereon.

# EXHIBIT B

# FEBRUARY 28, 2022
# LETTER TO  DRAPER



February 28, 2022

The Charles Stark Draper Laboratory, Inc.
555 Technology Square
Cambridge, MA 02139
Attention:       Winnie Lin (Sr Subcontracts Administrator)
                 Email:  wlin@draper.com

SUBJECT: Notice of Facility Acquisition

Ms. Lin:

Pursuant to section 19.1 of the Real Property Lease and Agreement ("Agreement") by and between The Charles Stark Draper Laboratory, Inc ("Draper") and i3 Technologies, Inc ("i3"), dated January 11, 2018, i3 is hereby exercising its right to purchase the Premises (as such term is defined in the Agreement) by providing the full payout of $217,666.71, which includes the One Dollar ($1.00) and represents full payoff of all amounts due and owing under the Agreement.  We expect the closing to occur on a timely basis and in all events within thirty (30) days of the date hereof (the "Closing").

i3 has invoiced Draper the amount of Three Hundred Twenty-Five Thousand Dollars ($325,000.00) as that is the balance allowed towards the roof repair referenced in section 7.1, of the above referenced Agreement. We expect that this invoice will be paid in full at the Closing.

Sincerely,

Roger Lucas
VP-Contracts
Ph.#: (919) 523-9356

# EXHIBIT C

# MARCH 2, 2022 PAYMENT TO DEFENDANT

# Payment Details



i3 Electronics, Inc.

### PAYMENT ID: 2383

| | |
|---|---|
| Payment Type | Wire - Domestic |
| Status | Approved |
| Entry Method | Created from Template |
| Template | Draper |
| Value Date | 03/02/2022 |
| Tran Date | 03/02/2022 |
| Credit Amount | 216,667.71 USD |
| Debit Amount | 216,667.71 USD |
| Exchange Rate | 1 |
| Customer Ref | Payoff |
| Tnum | 2859927 |
| Charges | OUR |

### DEBIT ACCOUNT

| | |
|---|---|
| Number | 5831 |
| Name | i3 Microsystems Operating |
| Type | Checking |
| Bank | MNTBANK |

### ORIGINATOR INFORMATION

| | |
|---|---|
| Name | I3 TECHNOLOGIES INC OPERATING ACCO |
| ID | 9868715831 |
| Type | DDA |
| Country | US |

### BENEFICIARY

| | |
|---|---|
| Name | Draper |
| Country | US |
| Account | 50461361 |

### BENEFICIARY BANK

| | |
|---|---|
| Account Type | Other |
| Bank Code | 026009593 |
| Bank | Bank of America, National Associati |
| Address 1 | 115 W 42ND ST, ONE BRYANT PARK |
| City | NEW YORK CITY |
| Country | US |

### AUDIT INFORMATION

| | Timestamp | User ID | Company |
|---|---|---|---|
| APPROVED | 03/02/2022 10:31:51 AM | | 444175255 |
| ENTERED | 03/02/2022 10:17:11 AM | | 444175255 |

: "This payment represents the full payoff of all amounts due and owing including the one dollar ($1.00) under the Real Property Lease and Agreement."

Continued

# EXHIBIT D

# APRIL 28, 2022 LETTER TO DRAPER



**HH&K**

Hinman, Howard & Kattell LLP

ATTORNEYS

80 Exchange Street | P.O. Box 5250 | Binghamton NY 13902-5250 | www.hhk.com

ANN B. CIANFLONE
Special Counsel
acianflone@hhk.com
P: (607) 231-6944
F: (607) 723-6605
ALSO ADMITTED IN PA

## NOTICE

## THIS NOTICE REQUIRES REPLY

## WITHIN 5 DAYS

VIA FEDERAL EXPRESS

April 28, 2022

The Charles Stark Draper Laboratory, Inc.
555 Technology Square
Cambridge, Massachusetts 02139
Attn:  Chief Administrative Officer

Dear Sir or Madam:

Hinman, Howard, & Kattell, LLP has been retained by i3 Technologies, Inc. ("i3") in connection with the failure by The Charles Stark Draper Laboratory, Inc. ("Draper") to turn over the deed for the facility located in St. Petersburg, Florida in accordance with the Real Property Lease and Agreement dated January 11, 2018 between i3 and Draper ("Lease").

Pursuant to Article 19 of Lease, i3 has the right to purchase from Draper, and Draper is obligated to transfer to i3, the Premises (as that term is defined in the Lease).  The purchase and transfer of the Premises was to occur on and as of the fifth anniversary of the Closing Date (as that term is defined in the Lease) or the earlier payoff of all amounts due and owing under the Lease. Section 3.2 permits the early pay-off of the amounts owed under the Lease thereby triggering the early right to purchase the Premises.

Draper was first notified by i3 on March 29, 2021 of its intent to purchase the property by paying off all the amounts owed. By letter of March 2, 2022, the full amount due and owing under the Lease was paid in full and i3 requested Draper transfer the Premises in a timely manner.  Over sixty (60) days have passed.  Draper has not honored its obligation under the Lease and has yet to transfer the Premises.

By letter dated March 30, 2022, for the first time, Draper alleged that i3 was in default of the various agreements between the parties, but did not include any defaults under the Lease. Notwithstanding the lack of default under the Lease, Draper attempted to rationalize its failure to transfer the Premises using the defaults under the other agreements, despite the Lease not containing a cross-default provision as an Event of Default under the Lease.   Now, by letter

dated April 14, 2022, Draper has, for the first time, six weeks after the failure to properly transfer the Premises to i3, made an allegation that i3 is in breach of Section 7.2 of the Lease, all in an attempt to justify its own breach of the Lease.   Draper provides no support for its allegations that i3 is in breach of Section 7.2 noting only that the breach is relating to facility security.

Specifically, Section 7.2, states, in pertinent party, "i3 Technologies agrees that it shall use best efforts to make such investments and otherwise take such actions as may be reasonably necessary to ensure that the Business produces items in sufficient quality and quantity to (i) obtain and maintain a security clearance for the facility; (ii) obtain and maintain ISO certification; …".  Your characterization of the Lease requirements in the April 14, 2002 letter as "i3TG's obligations to maintain a security clearance at the facility" is incorrect.  The obligations of i3 are to "use best efforts" to obtain and maintain security clearance for the facility.  As i3 has made best efforts, any purported lack of security clearance does not constitute a breach of the Lease thereby relieving Draper of its obligation to transfer the Premises.

In addition, although Draper has alleged that the payment of $325,000 was a condition to close on the Premises, a review of the March 2, 2022 letter from i3 does not make the payment of the $325,00 roof repair allowance a condition to close.  While i3 notes that it expects such payment at the closing of the Premises, under no circumstances does it state that it is a requirement of closing. Indeed, the only requirement is the deed from Draper. The payment of the roof repairs is governed by the Lease and will be handled accordingly.

Any other allegations of default under any of the other agreements between i3 and Draper are not relevant to the issue at hand and will be handled independently of the transfer of the Premises. Irrespective of whether or not there is any merit to the allegations of default under any of the other agreements, which i3 denies, the Premises must be transferred immediately.

Therefore, i3 Technologies, Inc. hereby demands turnover of the Deed as required by the Lease on or before May 4, 2022.

Very truly yours,

Hinman, Howard & Kattell, LLP

By: Ann B. Cianflone
Ann B. Cianflone
Special Counsel

cc: i3 Technologies, Inc.

The Charles Stark Draper Laboratory, Inc.
555 Technology Square
Cambridge, Massachusetts 02139
Attn:  Office of General Counsel

# EXHIBIT E

# DRAPER MAY 10, 2022 NOTICE OF DEFAULT LETTER

# D R A P E R

555 Technology Square
Cambridge, MA 02139-3563

10 May 2022

Hinman, Howard, & Kattell, LLP
Attn: Ann B. Cianflone, Special Counsel
80 Exchange Street
P.O. Box 5250
Binghamton, NY 13902-5250

VIA:   E-mail to acianflone@hhk.com

Dear Ms. Cianflone:

On May 4, 2022, Draper received your letter dated April 28, 2022 regarding issues pertaining to that certain Real Property Lease Agreement between The Charles Stark Draper Laboratory, Inc. ("Draper") and i3 Technologies, Inc. and i3 Electronics (collectively, "i3") dated January 11, 2018 (the "Lease"). Draper disagrees with many of the statements and contentions in your letter. This letter attempts to correct i3's misinterpretation of the Lease, set forth the correct factual history, and refocus the parties' relationship going forward toward achieving success on the critical mission of serving our nation's security interests.

Section 19.1 of the Lease states:

> 19.1.  Purchase of the Premises.
>
> On and as of the fifth anniversary of the Closing Date (or the earlier payoff of all amounts due and owing under this Agreement), *provided* that no Event of Default exists, Draper (or its assigns, as the case may be) shall transfer and convey to i3 Technologies, and i3 Technologies will accept and assume, and the Premises (and any liabilities and obligations related thereto) for consideration of One Dollar ($1.00). The form of the Special Warranty Deed (the "Deed") for the conveyance shall be substantially in the form attached hereto as Exhibit B. Draper shall convey title without any liens or encumbrances except for those liens or encumbrances that exist at the time of the execution of this Agreement and except for additional utility easements, covenants or restrictions compatible with the current usage of the Premises.

(Emphasis in original). Under Section 19.1, any contractual right that i3 may have had to purchase the Premises (as that term is defined in the Lease) can only be exercised "*provided* no Event of Default exists" (as the term "Event of Default" is defined in the Lease). Contrary to i3's position as stated in your letter, the critical issue is the existence of an Event of Default (or in the case of i3, multiple Events of Default) as of the time that i3 attempted to exercise any contractual right to purchase the Premises, not whether any notice of such Event of Default had been given. Though i3 may not have made you or your law firm aware, numerous Events of Default under the Lease existed at the time that i3 purported to exercise its rights under Section 19.1. Moreover, and though not necessary under Section 19.1, Draper has repeatedly and in writing made i3 aware of numerous Events of Default long before i3 purported to exercise its rights under Section 19.1.

While i3-caused Events of Default exist under various agreements between Draper and i3, contrary to your assertion that Draper is looking to another agreement, i3-caused Events of Default clearly exist under the Lease. Indeed, as you acknowledge, and by way of example, Draper considers i3 to be in breach of multiple obligations under Section 7.2 of the Lease, which states:

> 7.2 Performance Requirements. i3 Technologies agrees that it shall use best efforts to make such investments and otherwise take such actions as may reasonably be necessary to ensure that the Business produces items in sufficient quality and quantity to (i) obtain and maintain a security clearance for the facility; (ii) obtain and maintain ISO certification; and (iii) satisfy quality and scheduling needs of Draper's current and future customers, as set forth in the Subcontract Agreements to be negotiated by the parties, as defined in the Purchase Agreement. Draper shall have first priority for any work to be performed in the facility against any other customers' work.

By its own actions and inactions, i3 has demonstrated that it has failed to use best efforts to ensure that the Business (as that term is defined in the Lease) satisfies the requirements of Section 7.2. For example, but not by way of limitation, under Section 7.2(i), i3 has clearly failed to use best efforts in connection with its obligation to maintain a security clearance for the subject facility. As Draper has previously informed i3, the government lien against i3's Authorization to Operate ("ATO") puts program execution at severe risk. i3's ATO is so fundamental to program execution and so basic to the overall relationship of Draper and i3, that the lien by the government against the ATO demonstrates a clear lack of best efforts by i3. This failure to comply with government requirements necessary to maintain the ATO in good standing shows that i3 has not even satisfied basic black-letter requirements toward meeting its obligations. Further, under Section 7.2(iii), i3 has also clearly failed on multiple occasions to use best efforts to ensure that the Business meets its obligations to satisfy quality and scheduling needs of Draper's current and future customers, as set forth in the Subcontract Agreements between the parties. Despite repeated warnings and offers of assistance from Draper, i3 continues to delay proposal negotiations, and misses key delivery schedules and quality and quantity requirements for work already under contract. Given that time is of the essence under the Master Subcontract Agreement between Draper and i3 ("MSA"), i3's repeated failures demonstrates its fundamental lack of best efforts. As noted in Draper April 14, 2022 letter, i3's obligations with respect to security clearance, ISO certification, and satisfying quality and scheduling needs is also an i3 obligation under Section 6.2 of the Equipment Lease between Draper and i3. As such, Draper considers i3 to be in breach of the Equipment Lease.

Please note, though, that even if no Events of Default had existed when i3 purported to exercise its rights under Section 19.1, i3's attempts to exercise any such rights failed to comply with the requirements of Section 19.1 of the Lease, including, for example, by failing to tender all amounts due and owing under the Lease. Accordingly, because Events of Default existed and because i3 did not properly exercise any rights it may have had to purchase the Premises under Section 19.1, Draper recently returned to i3 the $216,667.71 that i3 had previously remitted to Draper. Accordingly, Draper directs i3 to continue making scheduled lease payments and to remedy the Events of Default under all agreements with Draper. Draper expects i3 to make the next scheduled Lease payments, plus any payments it did not make subsequent to its March 2, 2022 letter, by the next contractual payment date.

While Draper is taking actions to preserve its rights under its agreements with i3, and while Draper reserves all of its rights under all such agreements, it is important to note that Draper has not yet terminated any of those agreements, even though Draper would be within its rights to do so. Rather, Draper remains committed to working with i3 to find a productive path forward so that the relationship between Draper and i3 can satisfy their respective commitments to national defense efforts. To that end, Draper looks

forward both to continuing an open dialogue with i3 and to continuing to receive from i3 all required payments and performance under the Lease.

Please feel free to contact me at 617-258-4765 or avail@draper.com if you would like to discuss this letter.

Sincerely,

Alan Vail

Alan Vail
Deputy General Counsel

CC:   i3 Technologies, Inc.
      100 Eldridge Street
      Binghamton, NY 13901
      Attn: James T. Matthews
      E-mail: jim.matthews@i3electronics.com

      Alexa Adams, Vice President, General Counsel, Draper
      Dinanga Mulumba, Associate Corporate Counsel, Draper

# D R A P E R

555 Technology Square
Cambridge, MA 02139-3563

Letter Reference #: DRAPER 20220330

30 March 2022

i3 Technology Group, Inc.
(as parent of i3 Technologies, Inc., i3 Electronics, Inc. & i3 Microelectronics, Inc.)
100 Eldredge Street
Binghamton, NY 13901

ATTENTION:   Mr. James T. Matthews, jim.matthews@i3electronics.com
             Mr. Roger Lucas, roger.lucas@i3electronics.com
             Mr. Brian Sapp, brian.sapp@i3microsystems.com

VIA:         Fed Ex overnight courier
             Courtesy copy via electronic mail

SUBJECT:     **NOTICE OF DEFAULT**

REFERENCE(S): A:  Master Subcontract Agreement (MSA) between The Charles Stark Draper Laboratory, Inc. and i3 Technologies, Inc. dated 03 January 2018 and as amended on 06 March 2019, 28 April 2021 and 17 December 2021.
             B:  Classified Sponsor Assessment Results, dated 01 March 2022.
             C:  Purchase Agreement between The Charles Stark Draper Laboratory, Inc. and i3Technologies, Inc. and i3 Electronics, Inc. dated December 20, 2017.
             D:  Real Property Lease Agreement between The Charles Stark Draper Laboratory, Inc. and i3Technologies, Inc. and i3 Electronics dated January 11, 2018.
             E:  Intellectual Property License Agreement between The Charles Stark Draper Laboratory, Inc. and i3Technologies, Inc. dated January 11, 2018.
             F:  i3Microsystems letter, Subject Title, "Notice of Facility Acquisition", dated 02 March 2022.

Dear Messrs. Matthews, Lucas, and Sapp:

This letter serves as Draper's formal Notice of Default against i3 Technologies Group, Inc. ("i3TG" as parent and holder of all of the stock of i3 Technologies, Inc., i3 Electronics, Inc. and i3 Microelectronics, Inc.) pursuant to the Reference A MSA between Draper and i3TG. While Draper believes that there are multiple instances of non-compliance on part of i3TG under References A, C, D, and E, in the interest of best serving the United States Government and ensuring continued program execution, Draper's focus herein is on four high-priority Events of Default requiring immediate mitigation.

Draper hereby notifies i3TG that these four Events of Default (i) have had a Material Adverse Effect (as that term is defined in Section 1 of Reference C Purchase Agreement) or a material adverse impact on Draper, or (ii) would reasonably be expected to have a Material Adverse Effect or a material adverse impact on Draper if unremedied.

## CONDITIONS OF DEFAULT

### Default Condition 1: Delivery Shortages and Overpayment

As a primary condition of default, Draper cites i3TG's failure to meet subcontracted order quantities under Subcontract Number SC001-1233 Amendment 4, dated 11 December 2019 for twenty-eight (28) conforming RGP 1.0 module pairs. i3TG delivered a quantity of twenty-four (24) conforming bottom modules out of the order for

# DRAPER

555 Technology Square
Cambridge, MA 02139-3563

twenty-eight (28). The subcontracted delivery date for the total twenty-eight (28) conforming module pairs was 20 July 2020.

Further, Draper provided advanced payments to i3TG for the subcontracted and required twenty-eight (28) conforming module pairs. Since i3TG only delivered twenty-four (24) conforming bottom modules, i3TG received payment in excess of what it was entitled to under the applicable subcontract. Draper has repeatedly demanded a credit for the undelivered conforming bottom modules and received inaction to adequately reconcile on part of i3TG. For reference, see Draper's latest communication, Letter Correspondence 1233 20220303 RGP 1.0 Cure Notice, dated 03 March 2022.

Draper also cites i3TG's failure to meet subcontracted order quantities under Subcontract Number SC001-1233 Amendment 9, dated 22 January 2021 for twenty-eight (28) conforming RGP 2.0 module pairs. i3TG delivered a quantity of twenty-five (25) conforming bottom modules out of the order for twenty-eight (28). The subcontracted delivery date for the total twenty-eight (28) conforming module pairs was 30 November 2021.

Under Article 7.2(b) of the MSA, an event of default exists when "Subcontractor fails to make delivery of the supplies or to perform the services within the time specified in the Subcontract or any extension thereof, and does not cure such failure within a period of 10 days (or such longer period as Draper may authorize in writing) after receipt of notice from Draper specifying such failure." Draper previously notified i3TG of the failure to reconcile the two events mentioned above on numerous occasions, including the latest communication regarding RGP 1.0, Letter Correspondence 1233 20220303 RGP 1.0 Cure Notice, dated 03 March 2022 and with Subcontract SC001-1233 CO 13, issued to i3TG on 11 January 2022. i3TG has not cured these events of default within the required 10 days.

In addition, under Article 7.2(c), an event of default exists when "Subcontractor fails to perform any of the other provisions of this Agreement and/or the Subcontract in accordance with its terms, and does not cure such failure within a period of 10 days (or such longer period as Draper may authorize in writing) after receipt of notice from Draper specifying such failure." i3TG's failure to issue Draper a credit constitutes a breach of Article 2 (Payment) of the MSA. Draper previously notified i3TG of the overpayment and required credit, and i3TG has not cured this event of default within the required 10 days.

To the extent the prior communications are not considered sufficient notice under Articles 7.2(b) and 7.2(c), this letter shall serve as explicit notice of default.

## Default Condition 2: Failure to comply with Government Priority Rating and "Time is of the Essence" Provisions

As a second condition of default, Draper cites i3TG's failure to meet subcontracted delivery deadlines under various subcontracts, including Subcontract SC001-1351 in which i3TG delivered only twenty-five (25) conforming top modules out of sixty-two (62) and only thirty (30) conforming bottom modules out of seventy (70) by the contractual due date of 28 February 2022.

Failure to meet subcontracted delivery deadlines is an event of default under numerous provisions of the MSA, including but not limited to (i) the delivery requirements of a DX-A2 rated order in accordance with Article 8.7 (Government Priority Rating); (ii) delivery schedule and "time is of the essence" requirements of Article 1.4 (Delivery); and (iii) failure "to make delivery of the supplies or to perform the services within the time specified in the Subcontract" under Article 7.2(b).

In addition, i3TG communicated its intent to hold out on program deliveries via letter, Subject title, "SC001-1351 Payment Hold", dated 11 March 2022. This communication constitutes an anticipatory breach in direct violation of

# D R A P E R

555 Technology Square
Cambridge, MA 02139-3563

the requirements of DPAS rated orders and the Subcontract, and is an event of default under MSA Articles 7.2(b) and 7.2(c).

i3TG is fully aware of and the Parties have frequently discussed i3TG's failure to meet subcontracted delivery deadlines. To the extent the prior communications are not considered sufficient notice under Articles 7.2(b) and 7.2(c), this letter shall serve as explicit notice of default.

## Default Condition 3: Security Lien Program Authorization to Operate (ATO)

As a third condition of default, Draper cites the Government Sponsor's recent lien on i3TG's Security Authorization to Operate (ATO) as described in Reference B. This lien stems from multiple conditions of non-compliance with government-mandated security requirements and for which i3TG received formal Government notice on 01 March 2022. If the non-compliances remain unmitigated, the revocation of i3TG's ATO will result in Draper being unable to subcontract any government-funded work to i3TG, rendering program execution impossible.

Failure to maintain adequate security controls is an event of default under numerous provisions of the MSA, including but not limited to (i) Article 8.11 (Compliance with Laws); (ii) Article 8.13 (Federal Government Prime Contract Clauses); (iii) Article 8.14 Compliance with Government Requirements); and (iv) the requirement to implement required security controls pursuant to Section 10 of each "Statement of Work and Schedule" for individual subcontracts pursuant to the MSA. Further, i3TG's failure to abide by the MSA and federal security requirements is an event of default under Article 7.2(c).

Draper has previously notified i3TG of its failure to meet its security requirements. To the extent the prior communications are not considered sufficient notice under 7.2(c), this letter shall serve as explicit notice of default.

## Default Condition 4: Defective Pricing

As a fourth condition of default, Draper cites the Defense Contract Management Agency's (DCMA) recent reports, Case No. S1009A21P0047 dated 14 December 2021 and Case No. S1109A21P0029 dated 10 November 2021, that reviewed i3TG's proposals, #21033 dated 23 July 2021 and #21008 dated 18 February 2021, respectively. As part of its proposals, i3TG submitted Certificates of Current Cost or Pricing Data, certifying that i3TG's cost or pricing data are accurate, complete, and current.

i3TG was provided copies of the above reference reports on 18 February 2022 and 22 February 2022, respectively. i3TG, in its return correspondences, Subject title, "SC001-1351 Payment Hold", dated 11 March 2022 and Subject title, "Letter of Subcontract Agreement FY21/22 Production (SC001-1411)", dated 11 March 2022, disputed DCMA's results and asserted that DCMA was working with "flawed data", data in which i3TG provided directly to DCMA.

In light of DCMA's findings and i3TG's response to the findings, in accordance with FAR 15-407-1, Draper has determined that i3TG's cost proposals are defective. Providing defective pricing; failure to provide accurate, complete and current data; and i3TG's failure (and unwillingness) to correct defective pricing are events of default under numerous provisions of the MSA, including but not limited to (i) Article 8.11 (Compliance with Laws); (ii) Article 8.13 (Federal Government Prime Contract Clauses), which includes FAR 52-215-12; and (iii) Article 8.14 Compliance with Government Requirements) for individual subcontracts pursuant to the MSA.

This letter serves as explicit notice of default as described above.

## DEFECTIVE FACILITY EARLY BUYOUT REQUEST

With respect to i3TG's Reference F letter and in light of the above, because multiple Events of Default (as that term is defined in Section 1 of the Reference C Purchase Agreement) exist, i3TG is not currently entitled to exercise its



555 Technology Square
Cambridge, MA 02139-3563

rights under Article 19.1 of the Reference D Real Property Lease Agreement to purchase the St. Petersburg, FL facility.

Further, even if i3TG were currently entitled to exercise its rights under Article 19 of the Reference D agreement, i3TG's Reference F letter is defective since it purports to make closing contingent on Draper's payment of $323,611 for expenses for roof repair that i3TG has not yet incurred. Draper notes that Article 7.1 (Maintenance) of the Reference D Real Property Lease requires that any payment by Draper be in the form of reimbursement to i3TG "for (actual) *reasonable and documented* expenses incurred to replace the roof and the chiller on the Premises" (emphasis added). Based on knowledge and belief, i3TG has not yet incurred the costs for the roof repair referenced in the Reference F letter. And even if i3TG had already incurred the expense, making reimbursement of such expense a condition of closing is not consistent with the Reference D agreement.

To the extent i3TG's Reference F letter is considered an offer to purchase the St. Petersburg, FL facility or a counteroffer to the terms in the Reference D Real Property Lease Agreement, Draper declines and rejects both as being inconsistent with the previously executed agreement. Draper further asserts that simply curing the defective Reference F letter by removing the roof reimbursement contingency is insufficient due to unmitigated Events of Default.

## REQUEST FOR COOPERATION AND FURTHER ASSURANCES

As a DX-rated program, Ironwood carries the highest national defense urgency. Draper believes the interests of the Ironwood Sponsor and Buyer are of the utmost importance and reiterates this urgency to i3TG as a critical subcontractor in this effort. Draper has consistently attempted and welcomes the opportunity to continue open lines of communication on how to resolve the various program execution issues that are critically endangering mission success. In order to encourage partnership and mitigation of these concerns, Draper asks i3TG to work with Draper to bring each issue to resolution.

As immediate next steps, Draper requires the following actions and responses from i3TG:

1. Issue a credit to Draper for overpayment as it relates to RGP 1.0. Due Date: no later than 06 April 2022.
2. Agree, in writing, to the de-obligation of funds and quantities as a result of i3TG's RGP 2.0 delivery shortage under SC001-1233 Change Order 13, issued to i3TG on 11 January 2022. Due Date: no later than 06 April 2022.
3. Provide Draper with written adequate assurance of continued performance and confirmation that i3TG will adhere to the delivery schedules, quantities and dates under all Draper subcontracted efforts as required under DX-A2-rated orders. Due Date: no later than 09 April 2022.
4. With respect to i3TG's ATO, written confirmation that i3TG agrees to timely complete all corrective actions stated in the Plan of Action and Milestones (POA&M) approved by the Government. Due Date: no later than 09 April 2022.
5. Agree to pricing for current and future Draper subcontracted efforts that are consistent with DCMA reported findings, including DCMA Case No. S1009A21P0047, dated 14 December 2021 and DCMA Case No. S1109A21P0029, dated 10 November 2021. i3TG's written concurrence is due 09 April 2022. Further, and consistent with the foregoing, agreement to Letter Subcontract SC001-1411, issued to i3TG on 07 February 2022 and corrected on 14 February 2022 is required by 06 April 2022.
6. Draper believes it is in the best interests of the Government, Draper and i3TG to allow a Draper multifunctional team to inspect both the i3TG headquarters in Binghamton, NY and its i3TG facility in St. Petersburg, FL to examine i3TG records, internal processes, and manufacturing operations. The purpose of these visits is to assess i3TG's compliance with Federal Acquisition Regulations i3TG is committed to adhere to and sustain. Among the areas to be reviewed will be i3TG books and financial records associated with Draper subcontracts and related licensing payout estimation, security/cybersecurity corrective action

4 / 5



555 Technology Square
Cambridge, MA 02139-3563

progress, and i3TG current status and ability to meet projected subcontracted production rates. i3TG's written concurrence for these visits and agreement on visit dates is due 09 April 2022.

If i3TG fails to respond in the time provided and/or fails to provide the required assurances, Draper reserves the right to exercise any or all rights it has under its agreements with i3TG, including but not limited to:

- Revocation of i3TG's rights to exclusivity under the Reference E IP Agreement.
- Invoking Draper's indemnification, defense, and hold harmless rights under the Reference A MSA.
- Termination of the MSA for Default.
- Termination of the IP Agreement for Default.

Please continue to direct routine programmatic communications to:

- Walter Estrada, Director of Operations, Defense Systems westrada@draper.com
- Winnie Lin, Principal Subcontracts Administrator wlin@draper.com

Please direct any questions or concerns regarding this letter to Winnie Lin at 617-721-7200 or by e-mail at wlin@draper.com. You may also contact Dinanga Mulumba at 617-258-1439 or dmulumba@draper.com.

Sincerely,

Christina Mouradjian
Director, Contracts & Subcontracts

CC:     Neil Adams, Vice President, National Security and Space
        Sarah Leeper, Principal Director, Defense Systems
        Walter Estrada, Director of Operations, Defense Systems
        Alexa Adams, Vice President, General Counsel
        Dinanga Mulumba, Associate General Counsel
        Winnie Lin, Principal Subcontracts Administrator

# DRAPER

555 Technology Square
Cambridge, MA 02139-3563

Letter Reference #: DRAPER 20220330

14 April 2022

i3 Technology Group, Inc.
(as parent of i3 Technologies, Inc., i3 Electronics, Inc., & i3 Microsystems, Inc.)
100 Eldredge Street
Binghamton, NY 13901

ATTENTION:   Mr. James T. Matthews, jim.matthews@i3electronics.com
             Mr. Roger Lucas, roger.lucas@i3electronics.com
             Mr. Brian Sapp, brian.sapp@i3microsystems.com

VIA:         Fed Ex overnight courier
             Courtesy copy via electronic mail

SUBJECT:     **NOTICE OF DEFAULT – DRAPER REPLY TO I3TG RESPONSES**

REFERENCE(S): A:  Master Subcontract Agreement (MSA) between The Charles Stark Draper Laboratory, Inc. and i3 Technologies, Inc. dated 03 January 2018 and as amended on 06 March 2019, 28 April 2021 and 17 December 2021.
              B:  Classified Sponsor Assessment Results, dated 01 March 2022.
              C:  Purchase Agreement between The Charles Stark Draper Laboratory, Inc. and i3Technologies, Inc. and i3 Electronics, Inc. dated December 20, 2017.
              D:  Real Property Lease Agreement between The Charles Stark Draper Laboratory, Inc. and i3Technologies, Inc. and i3 Electronics dated January 11, 2018.
              E:  Intellectual Property License Agreement between The Charles Stark Draper Laboratory, Inc. and i3Technologies, Inc. dated January 11, 2018.
              F:  i3Microsystems Letter, Subject Title, "Notice of Facility Acquisition", dated 02 March 2022.
              G:  Draper Notice of Default, dated 30 March 2022.
              H:  i3TG Response to Notice of Default, dated 06 April 2022.
              I:  i3TG Response to Notice of Default, dated 08 April 2022.
              J:  Equipment Lease Agreement between The Charles Stark Draper Laboratory, Inc. and i3Technologies, Inc. and i3 Electronics dated January 11, 2018.

Dear Messrs. Matthews, Lucas, and Sapp:

Draper is in receipt of your Reference H and I letters (collectively, "i3TG's Response), provided in response to Draper's Notice of Default (Reference G). Draper disagrees with many of the statements and assertions in i3TG's Response. While Draper asserts that i3TG has not addressed all of the items described in the "Request for Cooperation and Further Assurances" Section of Draper's Reference G letter, Draper does not believe it is in the interest of the Ironwood and Title III programs to provide a line-by-line rebuttal to i3TG's Response at this time. Rather, the focus of this letter is to prioritize near term steps required to mitigate program impact. Nevertheless, deferral of Draper's reply shall not be deemed agreement with i3TG's statements or assertions, nor a release by Draper of the Conditions of Default, nor a waiver of any rights or remedies to which Draper is entitled.

Furthermore, Draper emphasizes that i3TG continues to be in default of not only the Reference A Master Services Agreement ("MSA") (as specifically addressed in Reference G) but also the Reference D Real Property Lease and the Reference J Equipment Lease Agreement (as summarized in Default Condition 5 below), and by implication

1 / 4

# D R A P E R
555 Technology Square
Cambridge, MA 02139-3563

the Intellectual Property License Agreement (Reference E), and the Purchase Agreement (Reference C). Because there are active and uncured Events of Default, as that term is defined in the Reference C, D, E, and J Agreements, Draper again asserts that i3TG is not entitled to early purchase the St. Petersburg, Florida facility.

Draper notes that in its Reference G letter, it inadvertently referenced "i3 Microelectronics, Inc." and omitted "i3 Microsystems, Inc." from the list of subsidiaries under i3 Technologies Group, Inc. ("i3TG"). For clarity, Draper reasserts Conditions of Default 1 through 4 as described in its Reference G Notice of Default to the extent applicable against i3 Microsystems, Inc. as a wholly-owned subsidiary of i3TG.

## Default Condition 1: Delivery Shortages and Overpayment (Reference G Follow-Up)
As of the date of this letter, Draper has not yet received the $133,123.60 credit related to SC001-1233 (RGP 1.0). Please remit payment of this sum to Draper in the form of a check no later than 15 April 2022 to The Charles Stark Draper Laboratory, Inc., Lockbox 3484, Boston, MA 02241. Draper acknowledges receipt of the signed Amendment 13 to SC001-1233. Subject to Draper's reservation of rights as described in this letter, Draper anticipates sending a fully-executed copy of the Amendment under separate cover.

## Default Condition 5: Breach of Real Property Lease and Equipment Lease Performance Requirements
Draper's Reference G Notice of Default identified four specific conditions of default, which represent breaches of various provisions of the Reference A MSA and the Reference C Purchase Agreement. With this letter, Draper further asserts and notifies i3TG that the Default Conditions 1 through 3 of Draper's Reference G Notice of Default also constitute breaches of i3TG's obligations under the Reference D Real Property Lease and the Reference J Equipment Lease, including the obligations under Section 7.2 and Section 6.2, respectively, related to facility security clearance and satisfying quantity and scheduling needs of Draper's customers. i3TG's breach of Section 7.2 and Section 6.2, respectively, are Events of Default as that term is defined in Section 15.1 of the Real Property Lease and Section 14.1 of the Equipment Lease.

As described in Draper's Reference G Notice of Default, the lien against i3TG's ATO puts program execution at severe risk. The non-compliances identified in the Reference B letter represent specific breaches of i3TG's obligations to maintain a security clearance for the facility. Draper will consider this specific event of default cured only after (a) i3TG has timely completed all corrective actions stated in the Plan of Action and Milestones (POA&M) approved by the Government, and (b) the government has released its lien on the ATO.

## Request for I3TG Information
During the in-person meeting at Draper on 05 April 2022, i3TG agreed to provide Draper with detailed information, including the information that i3TG provided to DCMA, and organizational information related to i3TG. This information will enable Draper to perform an independent financial analysis of i3TG's proposed prices for current and future subcontracted efforts (including SC001-1411) and to evaluate i3TG's ability to perform such subcontracted efforts. Accordingly, as an immediate next step, i3TG shall provide to Draper the information described in Attachment A to this letter by the dates listed therein.

## Revocation of Limited Exclusivity under the Intellectual Property License Agreement
Given the importance of the programs that Draper and i3TG support, and for the reasons described in both Draper's Reference G Notice of Default and this letter, and because i3TG has not satisfied all of the items described in the "Request for Cooperation and Further Assurances" Section of Draper's Reference G Notice of Default, Draper hereby revokes i3TG's limited exclusivity pursuant to Section 2.d. of the Reference E Intellectual Property License Agreement.

Nothing in this letter, including Draper's decision not to terminate the Intellectual Property License Agreement, shall be deemed a waiver of Draper's rights to do so in the future. Draper reserves the right to exercise any or all rights it has under its agreements with i3TG. Subject to the foregoing, Draper remains committed to working in

# DRAPER

555 Technology Square
Cambridge, MA 02139-3563

good faith with i3TG to resolve the conditions of default, other concern areas, and to negotiate fair and reasonable pricing and scope for current and future work.

Please continue to direct routine programmatic communications to:

- Walter Estrada, Director of Operations, Defense Systems westrada@draper.com
- Winnie Lin, Principal Subcontracts Administrator wlin@draper.com

Please direct any questions or concerns regarding this letter to Winnie Lin at 617-721-7200 or by e-mail at wlin@draper.com. You may also contact Dinanga Mulumba at 617-258-1439 or dmulumba@draper.com.

Sincerely,

Christina Mouradjian
Director, Contracts & Subcontracts

CC:        Neil Adams, Vice President, National Security and Space
           Sarah Leeper, Principal Director, Defense Systems
           Walter Estrada, Director of Operations, Defense Systems
           Alexa Adams, Vice President, General Counsel
           Dinanga Mulumba, Associate General Counsel
           Winnie Lin, Principal Subcontracts Administrator



555 Technology Square
Cambridge, MA 02139-3563

**ATTACHMENT A**
**TO**
**DRAPER LETTER DATED 14 APRIL 2022**
**(Letter Reference #: DRAPER 20220330)**

| # | INFORMATION REQUIRED | DUE DATE | COMMENTS/FOLLOW-UP |
|---|---|---|---|
| **Financial Information** | | | |
| 1 | Provide current policies and procedures related to proposals/pricing & estimating | 22 April 2022 | |
| 2 | Provide current version of Estimating System Manual | 22 April 2022 | |
| 3 | Provide all documents shared with DCMA for audit assists (FY 19, FY 21/22, FY20, TTP and B1B) | 22 April 2022 | |
| 4 | Provide DCMA feedback received by i3 on past audit assists (FY 19 and FY 21/22) | 22 April 2022 | |
| 5 | Provide specifics of what i3 disagrees with in the past audit assist reports (FY 19 and FY 21/22) | 22 April 2022 | |
| 6 | Provide the name, address, and firm of the consultant being used for unit pricing assumptions | 22 April 2022 | |
| 7 | Provide parent company level audited financial statements from all years 2018-2021 (P&L, Balance Sheet, Cash Flow Statement) | 22 April 2022 | |
| 8 | Provide i3 business-level official P&L statements from all years 2018-2021 | 22 April 2022 | |
| 9 | Provide latest Business Systems Status report signed by DCMA | 22 April 2022 | |
| 10 | Complete Standard Form 1408 (REV. 1/2014), Preaward Survey of Prospective Contractor (Accounting System), available at: https://www.gsa.gov/Forms/TrackForm/32838 | 22 April 2022 | |
| 11 | Complete Pre-Award Survey of Prospective Contractor Accounting System Checklist, available at: https://www.dcaa.mil/Checklists-Tools/Pre-award-Accounting-System-Adequacy-Checklist/ | 22 April 2022 | |
| **Personnel / Organizational Information** | | | |
| 12 | Provide official title, responsibilities, and job requisition from Human Resources for Robert Nead's current position | 22 April 2022 | |
| 13 | Provide official title, responsibilities, and job requisition from Human Resources for Brian Sapp's current position | 22 April 2022 | |
| 14 | Provide hiring plan for the ~50 open positions, including titles, current HR talent acquisition status, and expected hire date | 22 April 2022 | |
| 15 | Provide onboarding plan for new hires / expected onboarding time post hire (ex: 90 days) | 22 April 2022 | |
| **Schedule/Delivery Information** | | | |
| 16 | Provide copies of purchase orders of long lead material i3TG has stated in procuring and define which Program the materials track to. | 22 April 2022 | |

# EXHIBIT F

# MAY 17, 2022 LETTER
# FROM i3



# HH&K
## Hinman, Howard & Kattell LLP
### ATTORNEYS

80 Exchange Street | P.O. Box 5250 | Binghamton NY 13902-5250 | www.hhk.com

ANN B. CIANFLONE
Special Counsel
acianflone@hhk.com
P: (607) 231-6944
F: (607) 723-6605
ALSO ADMITTED IN PA

## NOTICE
## THIS NOTICE REQUIRES REPLY
## WITHIN 7 DAYS

VIA E-MAIL:  avail@draper.com

May 17, 2022

The Charles Stark Draper Laboratory, Inc.
555 Technology Square
Cambridge, Massachusetts 02139
Attn:  Alan Vail

Dear Attorney Vail:

We are in receipt of your letter dated 10 May 2022 and i3 Technology Group, Inc. ("i3") has received the return of $216,667.71 purchase price ("Purchase Price") for the St. Petersburg, Florida facility ("Facility") from The Charles Stark Draper Laboratory, Inc. ("Draper").  Because i3 has properly purchased the Facility in accordance with the terms of the Real Property Lease and Agreement dated January 11, 2018 between i3 and Draper ("Lease"), the Purchase Price is being held in escrow in the trust account of Hinman, Howard & Kattell, LLP.  The Purchase Price is available to you at any time in exchange for the deed, as required by the Lease.  Inasmuch as i3 has paid the Purchase Price to Draper, i3 demands that you turn over a deed, sufficient for recordation in the appropriate government offices, transferring the ownership of the Facility to i3 within seven (7) days of the date of this letter.

You have indicated that i3 has failed to pay all amounts due under the Lease to but have not provided any details regarding the amounts not paid; please provide the details of any unpaid amounts immediately.

Should Draper fail to honor the terms of the Lease and provide i3 with the deed within the time frame set forth herein, i3 will be forced to seek legal remedies available to it, including but not limited to, commencement of legal proceedings to effectuate the transfer of the Facility to i3. We will seek attorney's fees and costs incurred as a result of said legal proceedings.

Very truly yours,

Hinman, Howard & Kattell, LLP

By: _____
Ann B. Cianflone
Special Counsel

cc.  i3 Technology Group, Inc.
draperlegal@draper.com
Kimberly Kostun, Esq.